**UNITED STATES of America**

v.

**Ronald Dominic TANA, Defendant.**

**No. 85 Cr. 608 (GLG).**

United States District Court,
S.D. New York.

Oct. 7, 1985.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for plaintiff; William B. Pollard, Asst. U.S. Atty., of counsel.

Fischetti, Feigus & Pomerantz, New York City, for defendant; Ronald P. Fischetti, Mark F. Pomerantz, Warren L. Feldman, of counsel.

## OPINION

GOETTEL, District Judge:

The defendant, Ronald Tana ("Tana"), moves to dismiss his indictment, pursuant to Fed.R.Civ.P. 12(b)(2), for failure to allege conduct constituting a crime. For the reasons stated below, the motion is granted.

■ For purposes of this motion, the factual allegations of the indictment are accepted as true. *United States v. Napolitano*, 552 F.Supp. 465, 473 (S.D.N.Y.1982). During July 1980, Tana and his associates converted the window production equipment and raw materials of Yonkers Plate Glass, Inc. and its subsidiary Fedentrol, Inc. (collectively "YPG"). With the stolen assets, Tana and his associates started a new company, Associated Window Corporation ("AWC"). YPG had previously pledged all of its assets as security for $1 million in loans from the United States Department of Commerce, Economic Development Administration ("EDA").

The Government alleges that Tana violated 18 U.S.C. § 641 ("section 641") by stealing and converting the YPG property. Section 641 provides, in pertinent part,

[w]hoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof [shall be guilty of a crime].

18 U.S.C. § 641 (1982). The issue before this Court is whether the EDA's security interest in YPG's assets is a "thing of value of the United States" within the meaning of section 641 so that its conversion and use by another company constitutes a crime against the United States. The parties agree that this is an issue of first impression.

■ The Government contends that its security interest is "a thing of value" and that the removal of the property converted its interests. The Government first seeks to analogize this case to cases concerning the theft of information, *e.g., United States v. Girard*, 601 F.2d 69 (2d Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979) (defendant sold names of drug informants); or services, *e.g., United States v. Croft*, 750 F.2d 1354 (7th Cir. 1984) (defendant used employee paid

through a government grant for personal purposes). These cases held that section 641 punishes the theft of intangible as well as tangible property. The Government asserts that a security interest is an intangible property interest, the theft of which is subject to the same proscription. This is plainly wrong.

A security interest is an inchoate interest in property; the property may be tangible or intangible. Cases dealing with the distinction between tangibles and intangibles do not bear on the issue of whether a security interest in property, whether tangible or intangible, constitutes a "thing of value" within the meaning of section 641.

■ Closer to the matter at bar are the cases cited by the Government that concern the embezzlement of funds paid out by the United States Treasury. In these cases, as here, the Government was unable to claim title in, or possession of the funds in question. The courts focused on the degree of control retained by the federal agencies over the property. In assessing the degree of control retained,

[the courts have gauged] a number of factors including: (1) [the existence of a] specific reversionary interest in the federal government, (2) the statutory requirement that funds be used for the purpose intended, and (3) whether the recipient is required by federal law to maintain financial records, file reports, adopt government methods of management, or submit to federal oversight.

*United States v. Barreda*, 607 F.Supp. 419, 420 (N.D.Ind.1985). The greater the control, the more likely the courts are to find a violation of section 641. *See, e.g., United States v. McIntosh*, 655 F.2d 80, 84 (5th Cir.), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1450, 71 L.Ed.2d 662 (1981) (government regulations and restrictions on the disbursement of Farmer's Home Administration loans constituted "virtually complete" control over the loans, making them things of value for section 641 purposes); *United States v. Barreda, supra*, 607 F.Supp. at 422 (Federal revenue sharing funds were

subject to section 641. Extensive federal regulation of the handling of the funds, reporting requirements, as well as some restrictions on the use of the funds constituted sufficient federal control.). Thus, the case law indicates that the federal government must show substantial regulation of the use of, and usually a reversionary interest in, funds it has disbursed in order to claim sufficient control over allegedly diverted funds to invoke section 641.

In a situation close to the case at bar, the United States District Court for the Western District of Michigan held that proceeds of a Small Business Administration ("SBA") loan were not things of value within the meaning of section 641. *United States v. Gavin*, 535 F.Supp. 1345 (W.D. Mich.1982). The defendant in that case had embezzled SBA loan proceeds held by his corporation to purchase land and machinery in which the loan agreement gave the federal government a security interest. The court rejected the Government's argument that it retained a beneficial interest in the funds that it had paid out as part of the loan. The statute authorizing the loan did not grant a specific reversionary interest. "Neither [did] the statute manifest extensive federal control. The borrower [was] not required to maintain certain financial records, file reports, adopt government methods of management, submit to federal oversight or do anything except give security." *Id.* at 1348–49. Accordingly, the court held that the loan funds were not things of value within the meaning of section 641 and directed a judgment of acquittal.

In the instant case, EDA regulations and the loan agreement signed by YPG imposed some controls on YPG. Thus, YPG had to maintain business records and was subject to an audit. 13 C.F.R. § 309.9 (1985). Also, YPG could not "sell or transfer all or a substantial part of its assets." Loan Agreement at 6 (June 5, 1978).

■ If Tana had embezzled the EDA loan *funds*, the Government might have argued that it retained sufficient control of the funds to support an indictment under section 641. However, we do not believe this argument would have succeeded. In our view, the Government did not have sufficient control over the assets underlying its security interest to make the theft of those assets actionable under section 641. At no time were these assets United States property. The federal government never had title in, or possession of, or control over them. The Government's interest was inchoate; it could not subject the pledged assets to substantial federal control unless and until YPG defaulted on the loan.

■ Moreover, the Government still had the same right to foreclose its security interests on the removed machinery and inventory after it was converted to AWC's use. The conversion did not legally affect the Government's security interests in YPL's assets; it merely impeded their enforcement. (Whether this constituted an attempt to defraud the United States, or some other crime against the Government, is not a matter presently before the Court.)

Finally, it should be noted that the loan funds are not at issue in this case. Rather, it is the security interest that secured the loan of these funds that underlies this indictment. Thus, the embezzlement cases cited by the Government do not control our decision on the motion to dismiss this indictment.

■ More important, the legislative history of section 641 and of other sections of the federal criminal code indicates that Congress did not intend section 641 to apply to the theft or conversion of property in which the government merely holds a general security interest. The present section 641 originated in 1875 as chapter 144 of volume 18 of the United States Statutes at Large. We have found no instance during the 110 years since this section's adoption in which someone has been indicted under this statute for converting property in such circumstances. In 1933, Congress included in the Farm Credit Act provisions making actionable embezzlement or conversion of "property mortgaged or pledged to farm

credit agencies," 18 U.S.C. § 658 (1982). In 1948, Congress extended these provisions to cover all federal employees. Had Congress intended or understood section 641 to apply to pledged assets, the enactment of these provisions would have been unnecessary.

Expanding section 641 in the manner urged by the Government would expose vast new areas of conduct to federal criminal prosecution. Anyone, anywhere, who, knowingly or unknowingly, misappropriated property in which the federal government had a security interest, would be subject to federal criminal prosecution. Inevitably, the courts would be forced to draw fine distinctions to delineate the reach of section 641 in this new class of cases. The development of an area of law frought with such fine distinctions can and should be avoided, particularly where, as here, a variety of criminal statutes appear capable of prosecuting the conduct alleged herein.

█ Utilizing section 641 in this manner also invites a challenge on vagueness grounds. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." [1] *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Of course, language can never provide meaning with mathematical certainty. The test in determining whether or not a statute is unconstitutionally vague is whether "men of common intelligence must necessarily guess at its meaning." *Broadrick v. Oklahoma*, 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973). "The degree of vagueness that the Constitution tolerates ... de-

pends in part on the nature of the enactment.... Thus, the Court has ... expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are less severe...." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). The relatively severe criminal penalty to which the plaintiff may be subjected justifies applying some scrutiny to the statute in question.

█ A statute's certainty is measured with respect to the actual conduct of the person attacking the statute. *diLeo v. Greenfield*, 541 F.2d 949, 953 (2d Cir.1976). A fair reading of section 641 does not clearly indicate that the conversion of property in which the federal government holds a security interest violates its provisions. Thus, the statute, as applied, may be void for vagueness.

For all of the reasons noted, the Court concludes that the indictment fails to allege conduct violating 18 U.S.C. § 641 (1982). The motion to dismiss the indictment is granted.

SO ORDERED.

---

1. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person or ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policement, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to " 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972) (footnotes omitted).