**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Sheldon I. MATZKIN, Defendant–Appellant.**

No. 93–5246.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 28, 1993.

Decided Feb. 1, 1994.

**ARGUED:** John DeWitt Cline, Williams & Connolly, Washington, DC, for Appellant. Jack I. Hanly, Assistant United States Attorney, Office of the United States Attorney, Alexandria, VA, for Appellee. **ON BRIEF:** Thomas R. Dyson, Williams & Connolly, Washington, DC, for Appellant. Kenneth E. Melson, United States Attorney, Joseph J. Aronica, Assistant United States Attorney, Office of the United States Attorney, Alexandria, VA, for Appellee.

Before HAMILTON, Circuit Judge, CHAPMAN, Senior Circuit Judge, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.

**1016**

## OPINION

CHAPMAN, Senior Circuit Judge:

Following a trial by jury, Sheldon I. Matzkin was convicted on Count 1 of a four-count indictment which charged him with (Count 1) conspiracy to defraud the United States in violation of 18 U.S.C. § 371, (Counts 2 and 3) with bribery of an employee of the Department of the Navy in violation of 18 U.S.C. § 201(b), and (Count 4) with converting or conveying without authority a thing of value of the United States in violation of 18 U.S.C. §§ 641 and 642. He appeals his conviction and sentence presenting four issues for review: (1) Was it plain error for the trial court not to include a jury instruction on the statute of limitations in connection with Count 1; (2) was his trial counsel ineffective because he did not request a statute of limitations instruction; (3) was the conversion object (pricing information submitted by a potential contractor) a thing of value and the property of the United States as required by 18 U.S.C. § 641; and (4) was the district court clearly erroneous when it found at sentencing that Stuart Berlin was a high level, sensitive person under United States Sentencing Guideline § 2C1.1(b)(2)(B). We find no merit in any of the appellant's exceptions, and we affirm the conviction and the sentence.

### I.

Appellant Matzkin, an attorney and consultant practicing in the Washington, D.C. area, had certain defense contractors among his clients, including the NAVCOM division of Gould, Inc. and the Sierra Research Division of LTV Corporation. These two clients paid Matzkin a monthly retainer, and he also billed them separately for claims work he performed for them from time to time. Appellant obtained information and assistance from his contact at the Navy Department, one Stuart Berlin, who was a supervisory engineer and branch head with responsibility for the technical aspects of major procurements. Berlin's position made it possible for him to obtain and pass to Matzkin information about the scheduling, quality and bidding related to procurements by the Navy from defense contractors, such as LTV and Gould. This information was not available to the public or to prospective contractors. Having access to this information in advance gave Matzkin's clients an advantage in preparing proposals and bids for future work with the Navy.

Beginning in late 1978 or early 1979, Matzkin began paying Berlin $200 per month for the information and assistance Berlin provided on Navy procurements in which Matzkin's clients were interested. These payments were made from the retainers Matzkin received from his clients, and the delivery of the money was made by Matzkin to Berlin at various places they arranged to meet including restaurants, coffee shops and appellant's automobile. These monthly payments to Berlin were increased to $1,000 in 1986 when he asked for additional sums for his assistance relating to the SRQ–4 project, which was a shipboard radar terminal set that received information from helicopters of enemy positions. This increase in payments to Berlin required Matzkin to have his monthly retainers increased by his clients. Berlin provided valuable information as to the bid proposals of competitors in the SRQ–4 procurement and also whether the Navy would require best-and-final offers. Berlin also sat on the CARP (Contract Award Review Panel), which recommended that the contract for the SRQ–4 units go to Matzkin's client, Sierra.

Berlin testified that he and Matzkin were also involved in a Navy procurement for a tactical air navigation beacon, known as URN–25. This equipment was originally developed by Hoffman Electronics, which had been bought out by Gould, Inc. The Navy had been buying this equipment from Gould under "sole source contracts" so Gould had no competition in the supply of URN–25 and was anxious to keep this procurement as a "sole source contract." Berlin was the supervisor for the Navy engineers working on the URN–25 contract. He testified that he was paid by Matzkin over a number of years for information and assistance in maintaining these "sole source contracts" for Gould. Berlin also furnished Matzkin with bid information on a competitive procurement involving aircraft identification being sought by

Gould, Inc. and a competitor, Hazeltine Corporation.

Berlin was arrested and entered a plea agreement with the government. He became a primary witness for the prosecution in the present case and testified in detail as to his dealings with Matzkin as well as the information he supplied to and the payments he received from Matzkin. The jury found appellant guilty of conspiracy under Count 1 of the indictment but acquitted him on the remaining counts. At sentencing, the court increased the appellant's offense level by eight under U.S.S.G. § 2C1.1(b)(2)(B) because it found that Berlin had occupied a high level sensitive position within the meaning of the guideline.

## II.

Appellant was convicted of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. This offense was charged in Count 1 of the indictment, which is dated October 14, 1992, and sets forth 26 overt acts alleged to have been committed by Matzkin or a co-conspirator in furtherance of the purpose of the conspiracy. Of these overt acts, ten were allegedly committed within five years of the date of the indictment, and therefore within the five year statute of limitations created by 18 U.S.C. § 3282. Sixteen of the overt acts were allegedly committed prior to October 14, 1987 and are outside the statute.

In *United States v. Head,* 641 F.2d 174, 177 (4th Cir.1981), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3113, 77 L.Ed.2d 1367 (1983), we held that as a "general rule," in order to avoid the five year statute of limitations for conspiracies, the prosecution must prove an overt act in furtherance of the conspiracy committed within the limitations period. At trial, Matzkin's attorney did not request an instruction on Count 1 that the government was required to prove at least one overt act within the statute of limitations, and the trial court did not give such an instruction. The court did instruct that "at least one of the overt acts charged in the indictment at or about the time and place alleged, must be proved beyond a reasonable doubt as an essential element of the crime." Matzkin's attorney did not object to the lack of a statute of limitations instruction.

After conviction, Matzkin filed a motion for a new trial claiming (1) that the trial court committed plain error in failing to give a statute of limitations instruction on Count 1 and by instructing that the jury could convict on finding any one of the overt acts alleged, and (2) that his trial counsel was ineffective in failing to raise the statute of limitations issue by either submitting an appropriate instruction or by objecting to the court's failure to give a statute of limitations instruction. This motion was denied and Matzkin appeals.

### A.

■ A claim of ineffective assistance of counsel should be raised by motion under 28 U.S.C. § 2255 in the district court, and not on direct appeal, unless it "conclusively appears" from the record that the defense counsel did not provide effective representation. *United States v. DeFusco,* 949 F.2d 114, 120–21 (4th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 1703, 118 L.Ed.2d 412 (1992), *United States v. Fisher,* 477 F.2d 300, 302 (4th Cir.1973); *United States v. Mandello,* 426 F.2d 1021, 1023 (4th Cir.1970).

The present record does not conclusively demonstrate ineffective assistance of counsel. Therefore, we do not now address this issue, which may be asserted in a § 2255 *habeas* motion, if Matzkin desires.

### B.

"The statute of limitations is a defense and must be asserted on the trial by the defendant in criminal cases." *Biddinger v. Commissioner of Police,* 245 U.S. 128, 135, 38 S.Ct. 41, 43, 62 L.Ed. 193 (1917). "The statute of limitations set forth in 18 U.S.C. § 3282 is not jurisdictional. It is an affirmative defense that may be waived." *United States v. Williams,* 684 F.2d 296, 299 (4th Cir.1982) (citations omitted), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 961 (1983). Because the defendant did not request the statute of limitations instruction, he seeks to avoid the consequences of waiver by claiming that the failure of his attorney to

request such an instruction was a forfeiture under the recent opinion in *United States v. Olano,* —— U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), because his failure was not an intentional relinquishment of a known right; but was the failure to make the timely assertion of that right (to request the statute of limitations charge).

*Olano* addresses the discretion of a court of appeals to correct error under Rule 52(b) of the Federal Rules of Criminal Procedure, which states: "(b) Plain error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." *Olano* held that under Rule 52(b) the appellate court has "a limited power to correct errors that were forfeited because not timely raised in the district court." —— U.S. at ——, 113 S.Ct. at 1776. The appellate court's authority under the rule is circumscribed, and before it acts, four findings must be made.

> There must be an "error" that is "plain" and that "affect[s] substantial rights." Moreover, Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the Court of Appeals, and the court should not exercise that discretion unless the error " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985).

"If a legal rule was violated during the District Court proceedings, and if the defendant did not waive the rule, then there has been an 'error' within the meaning of Rule 52(b) despite the absence of a timely objection." *Id.* —— U.S. at ——, 113 S.Ct. at 1777.

█ Although mere forfeiture, as opposed to waiver, does not extinguish an error under Rule 52(b), it is still necessary that such error be "plain" which is defined in *Olano* as "clear" or "obvious."

█ We are convinced that the alleged error in the present case was not "plain error" within the meaning of the rule. The trial court properly instructed the jury on the essential elements of the crime charged in Count 1. One such element is proof of the commission of one of the overt acts alleged in the indictment. In *United States v. Head, supra,* we held that it was error for the trial court not to give a statute of limitations instruction in a conspiracy case when the charge was thrice requested. We did not conclude that such a charge was necessary in every case or that the statute of limitations had become an essential element of conspiracy. Nor did we hold that such a charge was required without a request, or that the absence of such a charge without a request was plain error. Nothing in *Head* changed the general rule that the statute of limitations is an affirmative defense to be raised by a defendant.

A finding of plain error when a court failed to sua sponte include an instruction relating to an affirmative defense would place an unnecessary and intolerable burden upon the trial court. If the present case involved but one alleged overt act, and there had been a serious conflict in the evidence as to whether such act was within the statutory time frame, the defendant's argument would have more substance. However, the present case involves 26 alleged overt acts, of which ten were within the five year period immediately preceding the date of the indictment, and there was ample evidence to prove a number of overt acts within the statutory period. Therefore, a statute of limitations defense would not be obvious to the trial judge or put the court on notice that it should give the jury instruction absent a request from counsel.

Because we have found no "plain error," it is not necessary that we proceed any further with the Rule 52(b) inquiry.

### III.

█ Appellant argues that his conspiracy conviction must be reversed because his conversion of pricing information, the purpose of the conspiracy alleged in the indictment, failed to charge an offense. The conversion focused on Matzkin's receipt from Berlin of information as to the amount of Hazeltine's bid on the UPM procurement (overt act 8). He contends that this pricing information was the property of Hazeltine and was not and could not qualify as "Property of the

United States" so as to fall within the language of 18 U.S.C. § 641, which is the federal law appellant is charged with conspiring to violate.

This statute provides in pertinent part:

Whoever ... knowingly converts to his own use or the use of another, or without authority, sells, conveys or disposes of any ... thing of value of the United States or of any department or agency thereof, ... Shall be fined not more than $10,000 or imprisoned not more than ten years, or both....

18 U.S.C. § 641 (1988).

Matzkin points out that "the Hazeltine cost proposal submitted to the Navy bore a legend identifying it as proprietary and restricting the government's use of the information," and he argued that at most, the government had only temporary custody of the Hazeltine information, which was insufficient ownership to support a § 641 charge. *See United States v. Hartec Enters, Inc.,* 967 F.2d 130, 133–34 (5th Cir.1992); *United States v. Tana,* 618 F.Supp. 1393, 1395–97 (S.D.N.Y. 1985). The appellant's objection to this indictment was not made until after the jury verdict, and we have held:

[A]ny review for alleged defect is to be reviewed, if at all, under a liberal standard, and "every intendment is ... indulged in support of sufficiency." *Finn v. United States,* 256 F.2d 304, 306–07 (4th Cir.1958). Here, the indictment simply mirrored the language of the statute in setting forth the offense charged, and charged both a criminal act and a criminal intent.

An indictment that tracks the statutory language is ordinarily valid. Fed. R.Crim.P. 7; *United States v. American Waste Fibers Co.,* 809 F.2d 1044 (4th Cir. 1987). One of the principal purposes of an indictment is to apprise the accused of the charge or charges leveled against him so he can prepare his defense. *See United States v. Miller,* 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985).

*United States v. Fogel,* 901 F.2d 23, 25 (4th Cir.) (footnote omitted), *cert. denied,* 498 U.S. 939, 111 S.Ct. 343, 112 L.Ed.2d 308 (1990).

In *United States v. Cobb,* 905 F.2d 784 (4th Cir.1990), *cert. denied,* 498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991), we held:

[T]he sufficiency of an indictment should be determined by practical, as distinguished from purely technical, considerations. Does it, under all of the circumstances of the case, tell the defendant all that he needs to show for his defense, and does it so specify that with which he is charged that he will be in no danger of being a second time put in jeopardy? If so, it should be held good.

*United States v. Missler,* 414 F.2d 1293, 1297 (4th Cir.1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970).

905 F.2d at 790.

The Supreme Court has held that where conspiracy is the "gist of the crime" all that is necessary in the indictment is that the object of the conspiracy be set forth sufficiently to identify the offense which the defendant is charged with conspiring to commit. *See Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927).

The present indictment charged Matzkin with knowingly and willfully conspiring

2. To commit offense against the United States, to wit: ...

b. conversion and unauthorized conveyance of a thing of value of the United States, having a value in excess of $100, in violation of Title 18 United States Code, Section 641.

This language clearly tracks the statutory language and overt act 8 is sufficient to advise the appellant of the charge he would face. This overt act alleges:

8. On or about February 25, 1988, SHELDON I. MATZKIN met with Stuart Berlin, and Berlin told MATZKIN that Gould/NavCom's initial offer on the UPM ( ) was approximately $50 million less than Hazeltine's.

Applying the liberal standard in support of sufficiency, we hold that the indictment was adequate to inform the defendant of the charges against him and that such charges are so specific that he is not in danger of

being placed in jeopardy a second time. However, appellant argues that even if the language of the indictment is sufficient this information passed by Berlin to Matzkin was not "Property of the United States."

On the issue of whether Navy procurement bid information qualifies as property of the United States, we are not persuaded by *United States v. Hartec Enters., Inc., supra,* or *United States v. Tana, supra,* upon which appellant relies. In *Hartec,* the defendant was manufacturing wire panels in fulfillment of a government contract. When it sold some of these panels for scrap, prior to delivery to the government, it was charged with theft of government property under § 641. The Fifth Circuit found that the government had not demanded or accepted any of the traditional incidents of title and it would be unjust to convict the defendants of stealing property that the government did not own. The court found that the government had no more than a security interest in the wire panels.

In *Tana,* the defendants were charged with a violation of § 641 because they had converted certain manufacturing equipment which had been pledged as security for a loan from the United States Department of Commerce. The court held that this security interest was not a thing of value under the statute because the government had no claim of title, claim of possession or claim of control over the property.

Section 641 is not a theft statute nor is it a codification of the common law of larceny. It is much more inclusive because it covers unauthorized sale and conversion which the Court has defined as the "misuse or abuse of property" or its use "in an unauthorized manner." *See Morissette v. United States,* 342 U.S. 246, 272, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952). The statute also covers both tangible and intangible property. *United States v. Girard,* 601 F.2d 69, 71 (2d Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979) (defendant sold names of drug informants).

The information submitted to the Navy Department by bidders for contracts is to be kept confidential until the award of the contract has been announced. Government employees are prohibited from disclosing this information outside the government. *See* 48 C.F.R. §§ 5.401 and 15.413. These rules protect the government from bids that may be the result of collusion between or among the bidders.

Matzkin concedes that the government had custody and possession of the information, but he argues these elements of ownership are not sufficient to bring the information within the statutory meaning of "Property of the United States." However, we are persuaded by the reasoning of *United States v. Berlin,* 707 F.Supp. 832, 839–40 (E.D.Va. 1989). This case involved the same confidential information about Hazeltine's bid on the UPM ( ) contract in competition with Gould, and the court found the government had a sufficient interest in the bid information to constitute property under § 641, relying upon *United States v. Perez,* 707 F.2d 359 (8th Cir.1983), in which it was held that the government had a sufficient property interest in $1,500 in currency, marked as a trial exhibit, to be a sufficient property interest under § 641. This currency was not subject to forfeiture, so it could not pass to the government, but the government's control over the money for the duration of the trial was a sufficient property interest under the statute. In *United States v. Bennefield,* 721 F.2d 128, 129 (4th Cir.1983), we held that the government's temporary possession of money paid by patrons of a non-commissioned officer's club as tips before the money was distributed to club employees was sufficient to permit prosecution of an employee under § 641 who converted the tip money.

It is not necessary that the government have the sole interest in the property or that it have sole knowledge of the bid information. The bidder will always know the amount of his bid, but this does not prevent the Navy Department, which has custody of the information, from using § 641 to prosecute someone who converts to his own use or without authority sells this information to another. There can be no argument that the amount of a confidential, competitive bid is not a thing of value. The amount of a competitor's bid would be the most valuable information that could be obtained by another bidder. In

the present case, the indictment alleges that Matzkin was advised by his co-conspirator that Matzkin's client's bid was $50 million less than its main competitor. This information was of great value to the government because the unauthorized use of this bid amount would allow Matzkin's client to increase its bid by many millions and still be the low bidder on the procurement. The government has possession of this information, and it does qualify as "a thing of value of the United States" until the award of the contract is announced.

## IV.

■ At sentencing, the district court enhanced the appellant's base offense level by eight because Berlin was in a sensitive position. The court enhanced an additional two levels because there was more than one bribe. However, the court refused the government's efforts to enhance because of defendant's role in the offense or his alleged obstruction of justice or because of the benefit-anticipated profit figures submitted by the prosecution. As to the sensitive position, the court made the following finding:

> I do think he was more than just a supervising engineer—he, being Berlin. He served on the CARP and was in a sensitive position; and his being in that position is what enabled him to give the information that he gave to Matzkin or Matzkin's client.

Appellant claims that the district court was clearly erroneous in finding Berlin to be covered by § 2C1.1(b)(2)(B) of the U.S.S.G. which provides in pertinent part:

> (b) Specific Offense Characteristics.
>
> * * * * * *
>
> (2)(B) If the offense involved a payment for the purpose of influencing an elected official or any official holding a high level decision-making or sensitive position, increase by 8 levels.

Berlin was a GS–15 Navy engineer and Matzkin argues that as such he was simply a mid-level employee with no power to award contracts on his own, and although he sat on some of the review boards, he is not the type person who holds a "sensitive position" under the guidelines.

Berlin had been a supervisory engineer and branch head of a number of Navy engineers with responsibility for technical aspects of major procurements. His position enabled him to obtain and pass on to Matzkin various information including the amount of certain bids made in Navy procurements. The information Matzkin obtained from Berlin and passed along to Matzkin's clients enabled the clients to adjust their bids accordingly. If the client had bid low and received information from Berlin that his was the lowest bid by millions of dollars, he could amend his bid upward and still receive the contract. This could cost the government great sums over a period of time.

Berlin's position on CARP was sensitive. There were only three members of CARP and they made the recommendation to Navy officials on large Navy procurements. Although CARP could not make the final decision that the contracts should be awarded to a particular bidder, senior Navy officials would not likely accept the bid without a favorable report from CARP. The district court found that it was Berlin's position on this review panel that enabled him to commit the crime with Matzkin.

Appellant cites *United States v. Stephenson*, 895 F.2d 867 (2d Cir.1990), in which the court found that the government official, who accepted bribes in return for favorably reviewing export license applications, was not in a "sensitive" position in the Commerce Department. We do not find Stephenson's position and Berlin's position comparable. Berlin was involved in decision making on multi-million dollar Navy contracts and had considerable discretion and influence in these matters. He also supervised other Navy engineers. We cannot say that the finding of the district court is clearly erroneous or that its conclusion is in error.

■ We find no merit to appellant's claim that he should not be given the eight level enhancement because Berlin did not receive the same enhancement at the time of his sentence. The government is not required to feed Matzkin and Berlin out of the same spoon. Berlin entered a plea of guilty and it

was a part of the plea agreement that he should not be considered a high level official at the time he committed the offense. Also, at the time of Matzkin's sentencing the court had much more information about Berlin's position, influence and responsibility.

For the reasons set forth above, the conviction and sentence of the appellant are affirmed.

*AFFIRMED.*