OPINION OF THE COURT
MORGAN, Judge:
Appellant pled guilty to forging the signature of the lienholder on an insurance check made out jointly to him and the Ford Motor Credit Corporation (FMCC) as a result of an automobile accident and to larceny of the total amount of the check. We specified two issues:
I. Whether appellant’s guilty plea to Charge 1[1] is provident in view of the lack *711 of evidence of any legal prejudice to the Ford Motor Credit Corporation where the purpose of having FMCC as a joint payee on the check at issue was the protection of FMCC’s security interest in appellant’s vehicle.
II. Whether appellant’s guilty plea to Charge II is provident where there was no evidence introduced at trial, or adduced during the providence inquiry, that FMCC had suffered any actual loss, or that such loss, if any, could be quantified as $3,643.74, where appellant was a joint payee with FMCC on the check at issue.
Answering specified Issue I in the affirmative and Issue II in the negative, we set aside the finding as to Charge II and reassess the sentence.
FACTS[2]
While driving under the influence of alcohol (DUI) one night, appellant slid his Ford Probe under the back of a large truck parked in the middle of the road, lights off. Although nobody was injured and the truck was undamaged, physical principles of mass and energy, unleashed by appellant’s use of the truck’s rear axle and differential to bring his vehicle to a stop, coalesced to damage appellant’s car to the tune of nearly $3500. Appellant was sent a check for $3,463.74 from his insurance company, Catawba Insurance, made out to him and to FMCC, to pay for repairs to his car, which he had purchased from McLaughlin Ford and financed through the FMCC. Repair work was undertaken through McLaughlin Ford. As the repairs neared completion, appellant faced an impending financial crisis. His court date for the DUI citation he received following the wreck loomed, and he did not have enough money to pay the fine. This crisis was exacerbated by: appellant’s recent divorce from his second wife in as many years, an Air Force E-6; bills, expenses, and support costs to his first wife and two children; and the significant decrement in income associated with his recent two stripe reduction following two failures to go. Appellant solved the immediate problem of the DUI fine by forging the name of one “Charles McLaughlin” on the check, presumably the namesake of McLaughlin Ford, signing his own name, and depositing the check in his account at the SAFE Credit Union, He did not, by his own admission, use the immediate proceeds of the check to pay McLaughlin Ford for the repairs to the car, but did use it in part to pay for the rental car he used while his was being fixed.
There is no evidence in the record as to whether the car was ever fixed, whether the repairs were paid for, and/or whether FMCC’s lien was ever satisfied. Nor is there any evidence as to the legal relationship, if any, between FMCC and McLaughlin Ford, the contractual arrangements associated with appellant’s financing of the car, or the insurance requirements which that financing might have specified. Mindful that evidence outside the record cannot be considered to determine the providency of a plea, United States v. Davenport, 9 M.J. 364, 367 (C.M.A.1980), we are forced to arrive at certain legal conclusions based upon the commercial law and our understanding of common practices in the U.S. auto retail industry. In the absence of any evidence to the contrary, we must assume that the FMCC is a discrete legal and corporate entity from McLaughlin Ford. Dealerships typically arrange financing through large corporate financing institutions, such as General Motors Acceptance Corporation (GMAC) and FMCC according to the particular make of vehicle they are selling. Dealerships are, almost without exception, not owned, in whole or in part, by the automobile manufacturers, nor by any of their subsidiary corporate entities. They are instead independent *712 ly owned franchises, almost none of which actually finance the cars they sell.
THE FORGERY CHARGE
It is undisputed that FMCC did not authorize the appellant’s indorsement of the check in their behalf. That is a necessary element of the offense of forgery, but it is not alone sufficient. There must additionally be proof that the false writing “would, if genuine, apparently impose a legal liability on another or change another’s legal rights or liabilities to that person’s prejudice.” Manual for Courts-Martial, United States, (MCM) Part IV, ¶ 48b(1)(b) (1994). Here the trial ran into difficulty, in the main because the military judge consistently referred to McLaughlin Ford as FMCC’s “agent,” “subsidiary,” or “representative.” This assumption had no basis in the record and prompted a voiced concern expressed by both trial and defense counsel during the providence inquiry to the effect that FMCC and McLaughlin Ford had discrete legal interests in the case not fully articulated by appellant in his responses to the military judge’s questions. Regrettably, the situation did not improve even after counsel brought it to the court’s attention.
As the lienholder on appellant’s title, FMCC had a purchase money security interest, (see S.C.Code Ann. § 36-9-107 (1993))[3], giving it certain priority as a creditor with respect to the car. It is in FMCC’s interest to preserve the value of the chattel securing that interest, which translates into ensuring that the car was repaired. For this reason, most institutions financing automobile purchases insist the purchaser-debtor carry appropriate collision and comprehensive insurance. In turn, insurance companies protect themselves from liability to lienholders, accommodating the purchase money security interest by making the holder of such interest a copayee on the checks. The leverage thereby acquired by the lienholder enables it to ensure that the car is, in fact, repaired.
Although S.C.Code Ann. § 36-3-404 (1993) states that a forged signature “is wholly inoperative as that of the person whose name is signed,” that does not mean that the forgery of FMCC’s indorsement is without legal, even criminal, consequences. Article 123, UCMJ, does not require that the forgery give actual legal vitality to an instrument, only that the signature would, if genuine, operate to the legal prejudice of the person whose signature was forged.
Unfortunately, in the Care [4] inquiry, appellant and the military judge mistakenly assumed that McLaughlin Ford, as FMCC’s “agent,” was the victim of both the forgery and the alleged larceny:
MJ: Okay. So as the check is altered with his signature as you put his signature on it, if all that was genuine then do you believe that that would operate to the legal harm of another and in this case the Ford Motor Credit Corporation?
ACC: Yes, sir.
MJ: And why do you believe that?
ACC: Because they repaired the vehicle and it was — and they spent money in order to repair it and that — the money was theirs.
Record of Trial, p. 20. Of course, FMCC did not repair the vehicle, was not liable for payment of those repairs, and the money was not theirs. The theory of “agency” which permeated the Care inquiry confused the independent rights of McLaughlin Ford to be paid for the repairs to appellant’s car with the right of FMCC to ensure that the car was repaired and led to appellant’s mistaken belief that the victim of his forgery was McLaughlin Ford — a belief abetted by the military judge.
Nevertheless, we are satisfied that the dual prongs of “intent to defraud” and “legal prejudice” are satisfied in this case, notwithstanding the imprecision in the Care inquiry. In the first instance, FMCC was actually prejudiced by appellant’s forgery insofar as it freed appellant to use the money intended for repairs for other purposes, *713 thereby frustrating the very purpose of their status as a copayee. That the car might have been (and probably was) ultimately repaired is of no consequence to this Charge, because the law does not require that the victim of a forgery actually be injured. The signature of one purporting to have authority to bind FMCC would, if genuine, have acted to relinquish the ability of FMCC to influence the use of the money to repair the car, thereby ensuring the continued value of the collateral securing their interest as a creditor.
Further, a payee’s indorsement of a valid negotiable instrument carries legal consequences with respect to that payee for all subsequent indorsers. Had the insurance check been dishonored, each indorser is liable on the instrument to any subsequent indorser or holder. See S.C.Code Ann. § 36-3-414 (1993); Conwed Corporation v. First-Citizens Bank & Trust Company, 262 S.C. 48, 202 S.E.2d 22 (1974). It does not matter that the check did not bounce, because the signature, if genuine, would have materially altered FMCC’s rights with respect to the instrument. Consequently, we find the appellant’s plea of guilty to the Charge provident notwithstanding his and the court’s confusion as to the identify of the victim or the precise nature of the right prejudiced thereby.
THE LARCENY CHARGE
On the other hand, we are unable to conclude that appellant was guilty of larceny. To be guilty of larceny, an accused must in some fashion take property from one having a “superior possessory interest” to himself. MCM, Part IV, ¶ 46c(1)(c)(ii). See also, United States v. McGregor, 6 C.M.R. 709, 711, 1952 WL 2458 (A.F.B.R.1952) (taking must be from “any other person having a right therein paramount to the alleged thief.”) FMCC was no more entitled to the whole of the insurance check than was appellant. Rather, they each held an indivisible interest in the whole governed by the terms of the security agreement between appellant and FMCC — an agreement not in evidence. The providence inquiry, as in Charge I, does not cure this difficulty, because it continued to orbit around the notion that McLaughlin Ford and FMCC were one and the same, premising the element of a wrongful taking around the obligation of appellant to pay McLaughlin Ford for the repairs.
Because state law governs the rights as between two co-payees on a negotiable instrument, there is scant federal authority on the subject.[5] On the rare occasions when the issue has presented itself in a federal context, federal courts have been loath to sort out the interests of such parties, particularly where there is an allegation of criminality. See, e.g., Duden v. United States, 199 Ct.Cl. 668, 467 F.2d 924 (1972) (husband not guilty of forgery, nor may copayee wife invoke protections of Check Forgery Insurance Fund, 31 U.S.C. §§ 561-64, where husband forged wife’s signature on joint income tax return check, in absence of proof that wife had superior possessory interest in proceeds of the check); cf. Isert v. Commissioner, 30 T.C.M. (CCH) 653, 1971 WL 2238 (1971) (forged indorsement of copayee on income tax refund does not qualify as casualty loss). When they have, it has only been after a painstaking, exhaustive analysis of the underlying contractual obligations of the parties in interest.[6] Appellant’s obligation with respect *714 to FMCC was to discharge his debt to them — a debt which existed independent of, and bore no relation to, any insurance payment for collision damage. It is conceded that the check was not sent to appellant to pay off his debt to FMCC, but rather to repair the collateral which secured that debt. What evidence exists in the record of trial indicates that the vehicle was, in fact, repaired. Whether, how, or when it was paid for, and the adjudication of the relative rights of appellant, FMCC, and McLaughlin Ford to possession of the vehicle, are interesting questions of commercial law, but are not helpful in deciding whether appellant stole money from FMCC.
Under the circumstances of this case, we doubt that the offense of larceny under Article 121 can be supported at all. Complex legal relationships of copayees on a negotiable instrument, the civil-commercial context in which the rights and obligations of each party in interest are ascertained, and the nature of inchoate interests in tangible property, do not lend themselves to a legally supportable conclusion, beyond a reasonable doubt, that one party or the other has a clearly superior possessory interest in a jointly held negotiable instrument.[7] Nor are they intended to. The UCMJ affords ample opportunity to address the actual criminal conduct of appellant in this case, and we are disinclined to twist its fabric to criminalize what are essentially civil, contractual delinquencies.
We conclude, therefore, that the failure to establish a superior possessory right of FMCC in the proceeds of the check in any liquidated amount, much less $3,463.74, as a matter of law, means that he cannot be convicted of that charge.[8]
The finding of guilt as to Charge II is set aside. Mindful that the military judge considered Charges I and II to be multiplicious for sentencing purposes, we are nevertheless compelled to conclude that an allegation of larceny of nearly $3,500 constituted a comparatively serious component of the charges against appellant, so we set aside the sentence and approve only so much of the sentence as extends to a bad-conduct discharge. The findings with respect to the remaining charges and specifications are correct in law and in fact, and are affirmed.

. Charge I was for forgery of the signature of FMCC on the insurance check made out to appellant and to FMCC, in violation of Uniform Code of Military Justice (UCMJ) Article 123 (10 U.S.C. § 923 (1994)). Charge II alleged larceny of the full amount of the insurance check, $3,643.74, in violation of Article 121, UCMJ (10 U.S.C. § 921 (1994)). Appellant was also charged with, pled guilty to, and was found guilty of driving while intoxicated and violating a commander's order not to drive on base. Arti *711 cies 92 and 111, UCMJ (10 U.S.C. §§ 892, 911 (1994)).

. We undertake a discussion of the facts with some trepidation. No evidence was introduced on the merits, nor was there a stipulation of fact. Consequently, we must rely exclusively on appellant’s version of events given in response to the military judge's inquiry. This paucity of evidence underscores the importance of the inquiry undertaken pursuant to Rule of Court-Martial 910(e). As well, the necessity in this case for us to connect the dots of fragmented testimony should serve to encourage the government to take full advantage of its right to flesh out the record in guilty pleas.

. South Carolina has adopted the Uniform Commercial Code in all material respects germane to this discussion. See S.C.Code Ann. §§ 36-1-101 et seq (1993).

. United States v. Care, 18 U.S.C.M.A. 535, 40 C.M.R. 247, 1969 WL 6059 (1969).

. In his concurring opinion, Judge Becker asserts that we need go no farther in our analysis than reference to S.C.Code Ann. § 36-3-116(b) (1993). That section treats with joint and several liability of parties to negotiable instruments, and does not declare the relative rights of such parties as against each other except by way of reference to the law of contribution if one party discharges the whole of a jointly held obligation. The official comment explains, “Indorsers normally do not have joint and several liability. Rather, an earlier indorser has liability to a later indorser.” But, "[i]f an instrument is payable to two payees jointly, both payees must indorse [and] have joint and several liability....."

. Federal courts have held that a security interest is an inchoate interest, which does not of itself constitute a property right which could be the subject of a federal prosecution for larceny. United States v. Tana, 618 F.Supp. 1393, 1395 (S.D.N.Y.1985). The government cites and the dissent relies upon United States v. Faust, 850 F.2d 575 (9th Cir.1988). That case turned on the basis of the admission at trial of elaborate proof of the underlying contractual and statutory rights between the government and Faust, establishing, *714 to the court’s satisfaction, that the government had a superior right to the proceeds of the check. It also drew significance from the fact that the government was the injured party in interest, and was thereby afforded broader protections than the public by virtue of statutory language designed to protect the public fisc. Faust, at 581. Neither situation is present here. The better view was expressed by the Supreme Court in McNally v. United States, 483 U.S. 350, 359-60, 107 S.Ct. 2875, 2881-82, 97 L.Ed.2d 292 (1987) which held that the mail fraud statute's prohibition on any scheme to defraud did not prohibit schemes to defraud individuals out of their intangible rights. See also United States v. Howard, 30 F.3d 871, 875-76 (7th Cir.1994) (security interest in insurance proceeds not "thing of value” for purposes of convicting defendant of conversion of government property).

. Even in the civil context there are sharp legal distinctions between the consequences to the various parties of a forged drawer’s signature and a forged indorsement. The UCC in a circuitous fashion arrives at the same result as the seminal case. Price v. Neal, 3 Burr. 1354 (K.B.1762). But even the comparative certainty afforded by the UCC does not avoid "a series of complex commercial paper conundrums,” "in only partial fulfillment of the drafters’ professed desire to dissipate any cloud of potential liability as soon as possible after a check transaction's dawn.” Perini Corp. v. First National Bank of Habersham County, Georgia, et. al., 553 F.2d 398, 399 (5th Cir.1977).

. The dissent incorrectly asserts that the majority holds that as a matter of law a copayee on a negotiable instrument cannot be guilty of the larceny of the proceeds of the instrument where he forges his copayee’s signature. That may be the approach taken by the concurring opinion, and it appears to be that taken by the Tana court, but it is not mine. The hypothetical situation posed by the dissent supplies critical factual elements informing the ownership rights between the two parties which this record entirely lacks. This information serves as the distinction between the Tana — Duden—Howard line of cases and Faust.