**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Thomas J. FAUST,**
**Defendant–Appellant.**

**No. 87–1166.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 13, 1988.

Decided June 28, 1988.

Doron Weinberg, Larson & Weinberg, San Francisco, Cal., for defendant-appellant.

Rodolfo M. Orhales, Asst. U.S. Atty., Crim. Div., San Francisco, Cal., for plaintiff-appellee.

Before GOODWIN, FARRIS and NELSON, Circuit Judges.

GOODWIN, Circuit Judge:

Thomas Faust appeals his convictions under 18 U.S.C. §§ 495 and 641 (1982) for forgery and embezzlement.

On October 8, 1980, the federal government entered into a security agreement with Tractug Associates in accordance with the Federal Ship Mortgage Insurance Program, Title XI, Merchant Marine Act of 1936. Under this agreement, the Maritime Administration (MARAD), which is a division within the United States Department of Transportation, guaranteed approximately $25 million in bonds and notes, thus enabling Tractug Associates to obtain financing for the construction of eight tugboats. Thomas Faust organized and was the general partner of Tractug Associates.

Section 2.07 of the security agreement addressed the issue of insurance and possible damage to any of the eight tugboats. The government required that the vessels be insured, with any loss over $100,000 payable to the Secretary of Transportation for distribution "by himself to himself and Tractug Associates." An endorsement subsequently required that losses exceeding $50,000 would be payable jointly to the Secretary of Transportation and Tractug Associates. A copy of the endorsement, signed by Faust, was forwarded by the broker, Fred S. James, to the underwriter, Marine Office of America Corporation (MOAC) on October 6, 1982.

On January 20, 1983, one of the insured vessels, the ZP Chandon, was damaged in an accident off Mobile, Alabama. The damaged tug was taken to Bender Shipbuilding and Repair Company. The vessel had sustained approximately $400,000 damage to its bow strut and propulsion unit (z-peller). To repair the damaged propulsion unit, Faust had parts removed from a partially completed vessel which was also being constructed with Title XI money at Valley Shipbuilding. The parts were transferred from Valley Shipbuilding (one of several companies organized by Faust) and were sent to Bender for installation on the ZP Chandon.

After the ZP Chandon was repaired, Bender refused to release the vessel until it received payment for its work. Faust asked Bender to release the vessel in exchange for an initial payment of $125,000, the balance of the charges to be agreed upon at a later date. This proposal called for MOAC to issue a check for $100,000 and for Faust to add the $25,000 balance which represented the deductible under the insurance policy. Faust and Bender agreed without the knowledge or approval of MARAD. Based upon this under-

standing and on the representations by Faust, Bender released custody of the ZP Chandon to Faust.

In March 1983, MOAC issued a draft in the amount of $100,000 payable jointly to Faustug Marine Corporation (one of Faust's entities) and to the Secretary of Transportation. The draft was sent to Faust for Faustug to add the $25,000 deductible and then to forward both amounts to Bender. Contrary to the agreement, Faust kept the $100,000 without advising MOAC or Bender. Faust contends, however, that he contacted MARAD and received what he believed to be an oral authorization to endorse the check from Gerald Neuman, the Associate Administrator for Maritime Aids. Faust endorsed the draft by signing his name, his company name and "Secretary of Transportation" followed by his initials "T.F." After Faust deposited the check, Faustug's controller, Thomas Bower, warned Faust that the endorsement was illegal and improper.

Faust contends that he was owed more than $300,000 by the insurance company at the time the $100,000 check was issued—$170,000 to be retained by him and $150,000 to go to Bender. Bender did not receive any of the proceeds of the check. Eventually, however, Bender repossessed the ZP Chandon, and MOAC issued new drafts totaling $149,922 payable to Bender.

In addition, MOAC issued a draft on August 19, 1983, in the amount of $31,469.60, payable to Faustug Marine Corporation and the Secretary of Transportation. Faust again signed both endorsements. This time, however, he did not place his initials next to his signature of "Secretary of Transportation." He deposited the draft into a Faustug operations bank account.

Finally, Faust received a third insurance draft in the amount of $28,348.62, dated September 2, 1983, which also required the endorsement of the Secretary of Transportation. He endorsed it as he had endorsed the second check. This time, Faust was initially unsuccessful in depositing the draft. A bank teller refused to accept the draft for deposit from Faust and directed him to a bank officer. Despite Faust's attempt to explain that the money was due him, the officer told Faust that the draft had been improperly endorsed and would not be accepted. The officer then placed a telephone call to MARAD. He was told by Harry Haskins from MARAD's ship-financing division that the draft was improperly endorsed and should not be accepted. The draft was then returned to Faust. A day later, on September 15, 1983, the same draft was deposited by Faust at another bank.

These events resulted in several civil law suits among MARAD, MOAC, Faust personally and through his various companies, and two commercial banks. Since then, Faustug Marine Corporation and the related businesses have either been dissolved, abandoned, or declared bankrupt. The tug from which Faust removed the parts placed on the ZP Chandon remains scrapped because Faust never replaced the z-peller. The z-peller had a value between $74,000 and $238,000. Faust asserts that the government received an insurance settlement check in the amount of $74,000 after Faust defaulted. After the default, MARAD sustained a $22 million loss when compelled to comply with its security obligations.

Faust was charged with three counts of uttering checks with forged endorsements in violation of 18 U.S.C. § 495 and with three counts of embezzling the proceeds of the checks in violation of 18 U.S.C. § 641. Faust was found guilty of the three § 495 counts and of one § 641 count (Count 2, involving the check for $100,000), and was acquitted of the other two § 641 counts. The court denied Faust's motions for acquittal under Fed.R.Crim.P. 29, made several times during and after trial.

## I. SUFFICIENCY OF THE EVIDENCE

Faust challenges the sufficiency of the evidence on all counts. When reviewing a jury's verdict, this court reviews the evidence in the light most favorable to the government and draws all reasonable inferences supporting the conviction. *United States v. Vincent,* 758 F.2d 379, 380 (9th

Cir.), *cert. denied*, 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985).

### A. *Section 641 (embezzlement)*. [1]

■ Faust contends that there was insufficient evidence to convict him of embezzlement. He argues that the government failed to prove that the United States suffered a property loss. *See United States v. Long*, 706 F.2d 1044, 1048 (9th Cir.1983). Faust argues that he was owed money from the insurance company at the time he cashed the checks. This is immaterial. He further claims that the parties entitled to the money eventually received all that was due them. This is untrue, as well as immaterial. In effect, Faust contends that because some funds eventually may have been delivered to the entity entitled to them, he committed no crime in shortstopping delivery by way of his bank account and spending the money.

■ Our cases have noted that in order to uphold a conviction under § 641, the government must have "title to, possession of, or control over" the funds involved. *United States v. Johnson*, 596 F.2d 842, 846 (9th Cir.1979). *See Long*, 706 F.2d at 1048. The government clearly had an ownership interest in the proceeds of each check described in the indictment. The Secretary of Transportation was a copayee of the check. By the terms of the security agreement with Faust, the proceeds of the check were payable to the Secretary for distribution by the Secretary to the Secretary and Tractug. The $50,000 payee clause specified that the insurance policy had been issued to Faust *and* the United States. *See* J. Appleman & J. Appleman, 5A *Insurance Law and Practice* § 3331 at 122 (1970) (the person to whom a policy is issued and in whose name it stands is usually considered its legal owner). These facts prove that the proceeds of the check were a "thing of value" of the government within the meaning of § 641.

■ Furthermore, this court has also looked to the amount of control the government has retained over funds when seeking to determine whether the funds are government funds within the purview of § 641. *See United States v. Von Stephens*, 774 F.2d 1411, 1413 (9th Cir.1985); *Long*, 706 F.2d at 1049–50; *Johnson*, 596 F.2d at 844–47. Here the government had substantial control over both the tugboats that were being built with Title XI funds and the insurance loss payments. The financing, construction, and operation of the tugboats was governed by the security agreement between Faust and the government. This document addressed numerous issues in detail. Furthermore, 46 C.F.R. Part 298 codified the restrictions imposed on Faust which were intended to protect the government's interest. *See, e.g.,* 46 C.F.R. § 298.40 (1987) (governing defaults, remedies and reporting requirements of ship operator); 46 C.F.R. § 298.41(b) (1987) (authorizing Secretary of Transportation to seize and foreclose vessels in event of default). The government also maintained tight control over the insurance. *See, e.g.,* 46 C.F.R. § 298.32(b)(6) (1987).

Faust relies on cases which require a showing that the government "suffered a property loss" in order to support a conviction under § 641. *See Long*, 706 F.2d at 1048; *United States v. Collins*, 464 F.2d 1163, 1165 (9th Cir.1972). However, neither of the cases cited addressed the point which Faust seeks to support. In *Collins*, a defendant wrongly deposited a city treasurer's warrant in an account controlled by defendant. The warrant was charged against an account in which the Department of Labor had deposited funds for a city program. The defendant later wrote a check against the account which he controlled, and a bank honored the check.

---

1. Section 641 provides, in pertinent part:

   Whoever embezzles, steals, purloins, or knowingly converts to his use ... or without authority ... disposes of any ... money[ ] or thing of value of the United States or of any department or agency thereof, or any property made ... under contract for the United States or any department or agency thereof....

   Shall be fined not more than $10,000 or imprisoned not more than ten years, or both....

   The word "value" means face ... value....

   18 U.S.C. § 641 (1982).

*Collins,* 464 F.2d at 1164–65. The court concluded that the converted funds did not constitute federal government property because the warrant was a city warrant. *Id.* at 1165. Thus, the issue was the federal nature of the funds. Obviously a property loss had been sustained. *See also Long,* 706 F.2d at 1048–50 (issue was whether meat which was bought by the government but diverted to defendants before delivery to Fort Lewis was government property). Furthermore, *Collins* has subsequently been distinguished on the grounds that the federal government in *Collins* did not retain sufficient control over the federal funds. *Johnson,* 596 F.2d at 846.

More on point is *Ailsworth v. United States,* 448 F.2d 439 (9th Cir.1971). In that case a defendant was employed at a Naval supply depot. He had heard that copper could be valuable for salvage. He intended to find out how valuable the copper was, by selling one or two pieces while hiding a pallet full of copper plates until after he had determined whether it was worthwhile to sell it. He was apprehended before he had sold the balance of the copper. The value of the pieces sold was less than $100, but the pallet full of copper plates was worth substantially more than $100. The defendant was convicted of felony theft under § 641 for theft of more than $100 of government property. *Id.* at 440–41. The question in *Ailsworth* was whether by hiding the pallets of copper the defendant exercised control over them while intending to steal them. If so, it was no defense that the pallets never left the government's enclosure, nor that the defendant could have changed his mind and decided not to steal

them. The court held that by hiding the copper pallets the defendant intended to steal government property within the meaning of § 641. The court reasoned that § 641 requires only an intent to appropriate government property "to a use inconsistent with the owner's rights and benefits." *Id.* at 442.

We find this reasoning persuasive. By cutting corners and depositing a check which was payable both to Faust and to the Secretary of Transportation, Faust willfully appropriated the proceeds of the check to a use inconsistent with the substantial rights and benefits of the government which was an owner of the proceeds. Faust intentionally deprived the government of the rights of supervision and control upon which the government insisted in originally approving the loans. Even if some of the proceeds eventually would have been distributed to Faust (and it is unclear that this is the case), Faust without consent usurped the government's control of the proceeds. This conduct was clearly in violation of the agreements and of the payee term of the checks. As Justice Holmes stated long ago, "[m]en must turn square corners when they deal with the Government." *Rock Island, Arkansas & Louisiana R.R. Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920).[2]

There was sufficient evidence to convict Faust of violating § 641.

## B. *Section 495 (forgery).* [3]

Faust also contends that the government failed to prove that there was sufficient

---

**2.** We also find that Faust's reliance on *United States v. Tana,* 618 F.Supp. 1393 (S.D.N.Y.1985), is misplaced. Notwithstanding the fact that a district court decision from another circuit is not binding on this court, we find this case distinguishable from *Tana.* In that case, the court found that the government did not have a sufficient interest in window production equipment pledged as security for a government loan. Thus, theft of the equipment did not fall within the prohibition of § 641. *Id.* at 1395. However, the court noted that if the government was able to demonstrate sufficient control over the assets underlying its security interest, the conversion would fall within § 641. *Id.* at 1396.

Thus, even under *Tana* the type of action involved here could be prosecuted under § 641.

**3.** Section 495 provides, in pertinent part:
   Whoever falsely makes, alters, [or] forges ... any ... contract[ ] or other writing, for the purpose of obtaining or receiving ... any sum of money; or
   Whoever utters ... as true any such false, forged [or] altered ... writing, with intent to defraud the United States, knowing the same to be false, altered [or] forged ...
   Shall be fined not more than $1,000 or imprisoned not more than ten years, or both.
18 U.S.C. § 495 (1982).

evidence to convict him of forgery. Faust attacks the forgery convictions on two fronts. First, Faust argues that the forgery convictions cannot stand because the government failed to prove that Faust defrauded the government out of money or property. Second, Faust argues that the government made out at best a case of fraudulent agency endorsement, not forgery.

### 1. *Intent to defraud the government.*

Faust contends that his convictions for forgery must be reversed in light of the Supreme Court's decision in *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). In *McNally*, the Court considered the mail fraud statute's prohibition on "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341 (1982). The Court held that the statute did not prohibit schemes to defraud individuals out of their intangible rights. Rather, the Court held that the statute prohibited only schemes to obtain money or property. The use of the disjunctive "or" was meant to make clear that "the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property." *McNally*, 107 S.Ct. at 2881.

Faust argues that a similar construction should be used to interpret the language of § 495. The statute describes in the disjunctive the crime of forging, which requires a "purpose of obtaining or receiving ... [a] sum of money," and the crime of uttering, which requires an "intent to defraud the United States."

However, *McNally* does not involve or even discuss § 495. In *McNally*, the Court was forced to distinguish several earlier cases which had interpreted a statute prohibiting conspiracies "to defraud the United States, or any agency thereof in any manner or for any purpose." *Id.* at 2881 & n. 8, distinguishing *Hammerschmidt v. United States*, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924) (construing predecessor of 18 U.S.C. § 371). In *Hammerschmidt*, the Court had construed the words "to defraud" to include not only schemes to "cheat the Government out of property or money" but also plans "to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." *Hammerschmidt*, 265 U.S. at 188, 44 S.Ct. at 512. The *McNally* Court also distinguished statutes which protect the government alone from those which also protect the citizens at large. *McNally*, 107 S.Ct. at 2881 n. 8. Considerations in the former type of statute exist which justify a broader scope. *Id.*, citing *Curley v. United States*, 130 F. 1 (1st Cir.1904). The crime of uttering as codified in § 495 protects only the government. Thus, it prohibits all attempts to interfere with or obstruct lawful government functions by circulating dishonest written material with criminal intent and knowledge of its falsity. Faust's actions clearly fall within this broad proscription.

Moreover, even if the crime of uttering requires an intent to defraud the United States of property, there was sufficient evidence to conclude that Faust violated the statute. In *McNally*, the Court noted that the phrase "to defraud" "is to be interpreted broadly insofar as property rights are concerned." *McNally*, 107 S.Ct. at 2879–80, citing *Durland v. United States*, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896). Faust's intent to appropriate the proceeds of the check to a use inconsistent with the substantial rights and benefits of the government was an intent to defraud the United States of a property right as contemplated by *Durland* and *McNally*.

### 2. *Agency endorsement.*

In *Gilbert v. United States*, 370 U.S. 650, 82 S.Ct. 1399, 8 L.Ed.2d 750 (1962), the Supreme Court analyzed § 495 and concluded that the statute "does not embrace a purported, but misrepresented, agency endorsement." *Id.* at 652, 82 S.Ct. at 1401, citing *Selvidge v. United States*, 290 F.2d 894 (10th Cir.1961). *See also Wright v. United States*, 172 F.2d 310, 311 (9th Cir.

1949) ("the genuine making of a writing for the purpose of defrauding another is not forgery"), cited with approval in *Gilbert*, 370 U.S. at 658, 82 S.Ct. at 1403. In *Gilbert*, Milo Gilbert was an attorney representing Daniel and Charline Bartfield. A check had been made out to "Daniel H & Charlene [*sic*] R. Bartfield c/o R Milo Gilbert." Gilbert endorsed the checks by signing the Bartfields' names, and then signing "R. Milo Gilbert, Trustee" underneath their names. *Id.* at 651, 82 S.Ct. at 1400. The court held that this agency endorsement, even if fraudulent and perhaps criminal, did not fall within the scope of the forgery statute. *Id.* at 652, 658–59, 82 S.Ct. at 1400, 1403–04. *Gilbert* is another way of saying that all forgeries are fraud, but not all frauds are forgeries.

■ *Gilbert* supports the defense to the false endorsement of the first check which had been initialed (Count 1). Faust's failure to use any qualifying adjective before his initials is not significant. *See Asher v. United States*, 480 F.2d 580, 583 (6th Cir. 1973). Neither is it significant that Faust's conduct undoubtedly violated other laws. He was charged in the count with forgery. Faust signed the words "Secretary of Transportation" rather than signing the name of the Secretary and he placed his initials next to this signature. These facts represented that Faust was signing as a purported agent of the Secretary, however fraudulent the representation of agency may have been. *See id.* Even viewing the evidence in the light most favorable to the government, the evidence proves evil intent and false pretense but does not prove forgery with regard to the first check.

■ The two checks which Faust endorsed as "Secretary of Transportation" and which he did not initial present a hard-

er question (Counts 3 and 5). On the one hand, there is no representation of agency on the face of the check, as there was in *Gilbert* and *Asher*. On the other hand, in offering a check endorsed with the words "Secretary of Transportation," Faust did represent either that the Secretary of Transportation had herself signed the check, or that an agent of the Secretary had signed it. However, there is no indication on the check that *Faust* had signed the check as an agent of the Secretary. Faust's conduct thus amounted at least to a forgery of an agency endorsement. His defense that it was a fraudulent agency endorsement is no defense. A forged endorsement is also a forgery. Thus, there was sufficient evidence to support convictions of forgery on these counts.

In light of *Gilbert*, we vacate the conviction on Count 1. There was, however, sufficient evidence to uphold the convictions on Counts 3 and 5.

## II. PROPRIETY OF THE JURY INSTRUCTIONS

■ Faust contends that the trial court's failure to instruct the jury according to his theory of the case constitutes reversible error. Faust's theory of defense on the embezzlement charge rested, at least in part, on a contention that he acted in good faith. Good faith, in general, constitutes a complete defense to any crime which requires fraudulent intent. *See, e.g., United States v. Ammons*, 464 F.2d 414, 417 (8th Cir.) (quoting a jury instruction which stated that good faith was a complete defense), *cert. denied*, 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 253 (1972). Thus, Faust requested a jury instruction entitled "No Intent to Defraud." This request was denied.[4]

---

4. The trial court's jury instruction on the embezzlement count included the following:

It is not necessary to prove that the Defendant knew that the Government owned the property at the time of the wrongful taking so long as it is established, beyond a reasonable doubt, that the Government did in fact own the money or property involved, that it had a value in excess of $100 and that *the Defendant knowingly and willfully embezzled or converted it.* (emphasis added)

The court's instructions on forgery including the following:

The term "forgery" means that the payee's endorsement on a check was written or signed without the payee's permission or authority.

.    .    .    .    .

To act with "intent to defraud" means to act knowingly and with the specific intent to deceive, ordinarily for the purpose of causing

■ Faust states, correctly, that it is "reversible error to refuse a charge on a defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient to render the accused innocent." *United States v. Lewis*, 592 F.2d 1282, 1285 (5th Cir.1979). However, a defendant is not entitled to any particular form of an instruction so long as the instructions given fairly and adequately cover his theories of defense. *United States v. Solomon*, 825 F.2d 1292, 1295 (9th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 782, 98 L.Ed.2d 868 (1988). The trial court has broad discretion in tailoring the precise language of jury instructions and even " '[i]mperfectly formulated jury instructions will serve as a basis for overturning a conviction only upon a showing of abuse of discretion.' " *Id.*, quoting *United States v. Hayes*, 794 F.2d 1348, 1351 (9th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987).

■ Faust first contends that the court erred in denying his requested instruction on agency. The court properly refused to give an agency instruction because there was no indication of agency on the endorsements in the checks that were the subject of Counts 3 and 5;[5] nor was there any testimony that Faust was actually an agent, or even reasonably believed that he was an agent, of the Secretary of Transportation. *See Jolly v. United States*, 411 F.2d 618, 619 (9th Cir.1969); *see also United States v. Gilbreath*, 452 F.2d 992, 993 (5th Cir.1971).

■ The trial court's instructions on embezzlement and forgery adequately covered the elements of good faith. The instructions clearly required the jury to find that Faust knowingly and willfully embezzled or converted the property before they could find him guilty. This instruction precluded the possibility that the jury could

have convicted Faust of embezzlement despite any belief that Faust acted in good faith. *See United States v. Green*, 745 F.2d 1205, 1209 (9th Cir.1984) (a defendant is not entitled to a separate good faith instruction when the court gives an adequate instruction on specific intent), *cert. denied*, 474 U.S. 925, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985).

■ We similarly conclude that the trial court's instruction on forgery adequately addressed the issue of authority. The instructions required the jury to find that the endorsement was "written or signed without the payee's permission or authority." This was adequate to insure that the jury would not find Faust guilty if it believed, as Faust argued, that one Gerald Neuman had given him authority to endorse the check. The court did not abuse its discretion in denying the particular instruction on authority which Faust requested. *See Solomon*, 825 F.2d at 1295.

## III. PRIOR BAD ACTS EVIDENCE

Faust protests the admission of two letters under Fed.R.Evid. 404(b). The first was a letter written by Mustang Power Inc., a marine supply company, in which an estimate was given for ship generators. Faust altered the letter, as shown by his handwriting on a copy of the original letter. Faust photocopied the letterhead, drafted a new invoice and forged the signature of the Mustang Power salesman. Although Faust did not recall whether he had created the invoice, he explained that if he had done so, it would have been to speed up the delivery of equipment and payment thereon. The evidence was clearly relevant to his state of mind and contradicted his professions of good faith or mistake.

The second item was a redraft of a letter originally written by Thomas Bower to Lar-

---

some financial loss to another or bringing about some financial gain to one's self.

An act is done knowingly if the defendant realized what he or she was doing and did not act through ignorance, mistake or accident. You may consider the evidence of the defendant's acts and words, along with all the other

evidence, in deciding whether the defendant acted knowingly.

**5.** Because we have vacated the conviction on Count 1, we need not address whether the court erred in not giving an agency instruction with reference to that count.

ry Cantrell. Faust had intercepted the original letter. He then rewrote it, forged Bower's signature and mailed the correspondence.[6]

Faust contends that admission of these letters was error in three respects. First, he argues that the government failed to meet the foundational requirements of Rule 404(b). Second, he argues the court failed to perform the balancing analysis required by Rule 403. Third, he contends that the prejudicial effect of the evidence outweighed its probative value.

We review the admission of such evidence for abuse of discretion. *See United States v. McKoy*, 771 F.2d 1207, 1214 (9th Cir.1985) (Rule 404); *United States v. Bailleaux*, 685 F.2d 1105, 1112 (9th Cir.1982) (Rule 403).

### A. *Mustang Power letter.*

Rule 404(b) is a rule of inclusion. *United States v. Bradshaw*, 690 F.2d 704, 708 (9th Cir.1982), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983). However, evidence of extrinsic acts must be relevant to an actual issue in the case. *United States v. Hodges*, 770 F.2d 1475, 1479 (9th Cir.1985). The trial court ruled that the government had satisfied its burden of showing the relevance of the Mustang Power letter. Faust contends that knowledge, awareness and lack of accident were not contested issues in this case. Rather, he argues the issue was good or bad faith. We are not impressed with this distinction.

■ A district court's decision to admit evidence under Rule 404(b) will be upheld on appeal if the evidence is admissible on any of the enumerated grounds. *United States v. Green*, 648 F.2d 587, 592 (9th Cir.1981). Faust defended his conduct in endorsing and depositing the checks at issue, on the specious grounds that he had authority to do so, or at least believed that he had such authority. In essence he claimed that his intentions were honorable. Thus, intent was clearly an issue; the forged letter was relevant to his intent to forge checks, and to the absence of mistake or accident in signing for the Secretary of Transportation.

Faust contends that the government's failure to show that he lacked authority to alter the Mustang Power letter rendered the evidence's relevance tenuous. *See United States v. Hernandez–Miranda*, 601 F.2d 1104, 1108–09 (9th Cir.1979). Faust relies on *United States v. Peterson*, 808 F.2d 969 (2d Cir.1987). In *Peterson*, the defendant was charged with knowingly possessing a check stolen from the mail (the Azapian check). Her defense was that she had never seen the check, did not endorse it and did not know it was stolen. The government was allowed to introduce the testimony of a handwriting expert that Peterson had endorsed a stolen check payable to Williams. The prosecutor represented that the government had information from Williams that she had never received the check. However, the government did not introduce any evidence to show that the Williams check was ever missing, stolen or deposited by Peterson. *Id.* at 971–73. The court of appeals reversed, noting among other things, that there was no evidence that Peterson was not authorized to endorse Williams' name. *Id.* at 975.

We are unpersuaded by Faust's citation of *Peterson*. Faust's conduct in manufacturing a wholly spurious invoice and signing the Mustang Power's salesman's name was more extensive than Peterson's conduct in endorsing the Williams check. Some gullible person might imagine a scenario in which Peterson could have had authority to endorse the Williams check. Moreover, unlike *Peterson*, the states of mind in altering the document and forging the signature are essentially the same. In *Peterson*, a forged endorsement on one check which might not even have been stolen, was offered to prove knowledge, not that another check was forged, but that it was stolen. Here by contrast, one forged

---

**6.** The government also sought to introduce a memorandum written by Bower which admonished Faust for having forged his signature without permission on the Cantrell letter. The court denied admission of this memorandum.

signature was offered to prove that Faust operated in a manner that utilized forged signatures.

■ We conclude that the evidence was relevant and properly admitted under Rule 404(b). Even in the absence of an explicit record documenting the court's balancing of prejudice and probative value, Faust's conclusions about prejudice do not convince us that the letter's probative value was outweighed by its prejudice. On this record, we cannot say that the trial court abused its discretion in admitting the evidence.

### B. *Cantrell letter.*

■ Faust also argues that the Cantrell letter was improperly admitted. His argument on this point is less convincing than his argument on the Mustang Power letter. Here, evidence of lack of authority was clear—Bower testified that he had never given Faust authority to sign his name. Faust argues, however, that forgery of a signature in a letter sent in a "commercial dispute" is irrelevant to the forgery of a signature on a check. He contends that the former does not necessarily entail the essential element of criminal forgery, an intent to defraud. However, the Cantrell letter was not introduced merely to show intent to defraud; it was also introduced to rebut Faust's defense that he had authority to endorse the check, or mistakenly believed that he had such authority. The evidence was relevant on this point.

We conclude that the court properly admitted the Cantrell letter under Rule 404(b). Nor are we swayed by Faust's further allegations of prejudice. The prejudice was of Faust's own making. Forgeries tend to embarrass forgers. We cannot conclude that the court abused its discretion in admitting this evidence.

### IV. ADMISSIBILITY OF DRAFT LETTER

Faust contends that evidence regarding his state of mind was improperly excluded. Specifically, Faust refers to the government's attempt to prove that he signed a loss payee clause in late September 1982,

before the insurance check was issued. To this end, the government introduced a copy of an endorsement which was signed by Faust and countersigned by Dean Steeger, a MOAC employee. Faust argues that he did not sign this loss payee clause until August 1983. At that time, he claims he was being blackmailed by MOAC and forced to backdate the endorsement or else risk the chance that loss payments would be withheld. He further testified that when he signed the original, he crossed out the date next to Steeger's name. The original was not produced by the government. Faust postulates that the acquittals on Counts 4 and 6 (involving checks under $50,000) indicate that the date on which Faust signed the endorsement was a pivotal issue for the jury.

To support his testimony, Faust attempted to introduce a draft of a letter he proposed to send to Steeger protesting the newly endorsed payee clause. The letter was offered as circumstantial evidence of state of mind. The government objected to the exhibit as self-serving. The trial court refused to admit the letter, not on the government's grounds, but because Faust's beliefs had just been expressed to the jury. Faust asserts that the exclusion of this letter precluded him from corroborating his story as to what his state of mind was in August 1983.

A trial court's evidentiary ruling will be reversed only where there has been an abuse of discretion, and only if that evidentiary error would have more likely than not affected the verdict. *United States v. Emmert*, 829 F.2d 805, 808 (9th Cir.1987).

■ Hearsay is admissible if it is a statement of the "declarant's then existing state of mind." Fed.R.Evid. 803(3). In order to determine admissibility under this rule a court must examine three factors: contemporaneousness, chance for reflection, and relevance. *United States v. Ponticelli*, 622 F.2d 985, 991 (9th Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980). Contemporaneousness is disputed. Depending on whose version of the facts is believed, Faust either drafted the letter soon after he was allegedly blackmailed into signing and postdating the

endorsement or long after he had originally signed the endorsement. Although the evidence may be relevant in light of the fact that Faust was allowed to testify to all the facts contained in the letter, the draft itself was cumulative and its probative value slight.[7]

Faust's opportunity to reflect in drafting the letter, however, weighs heavily against admission. Rule 803(3) is related to the exceptions created by Rules 803(1) and (2), which allow statements of present sense impression and excited utterances. *See Ponticelli*, 622 F.2d at 991; Fed.R.Evid. 803(1), (2). The theory behind all three exceptions is that "[t]he greater the circumstances for misrepresentation, the less reliable is the declaration." *Ponticelli*, 622 F.2d at 991. The circumstances in this case allowed Faust to think long and hard before drafting the letter. Indeed, the fact that Faust went through several drafts indicates that he had ample time to reflect upon his statements. Thus, any evidence provided by the letter was unreliable, and the court did not abuse its discretion in excluding it. Furthermore, given the fact that Faust was allowed to testify extensively about the content of the letter and his state of mind, we do not find that the admission of the letter would more likely than not have affected the verdict. *See Emmert*, 829 F.2d at 808.

The conviction on Count 1 is REVERSED. The convictions on Counts 2, 3 and 5 are AFFIRMED.

---

7. Faust relies on *United States v. Parry,* 649 F.2d 292 (5th Cir.1981), in asserting that the letter was admissible. In *Parry,* the defendant did not deny that he participated in the drug transaction as charged but argued that he proceeded upon the good faith belief that he was working for government agents. To corroborate his testimony, the defendant sought to introduce his mother's testimony as to a conversation whereby the defendant told her that he knew the true identity of the agents. The trial court, sua sponte, ruled that the mother's testimony constituted excludable hearsay. The Fifth Circuit reversed, holding that the out-of-court utterance was intended as circumstantial evidence of the defendant's knowledge of the existence of a fact, rather than as testimonial evidence of the truth of the matter asserted. Thus, it should have been admitted. *Id.* at 295.

Faust, however, did not offer the testimony of a third party who had heard his statement of his belief. This was not a case of exclusion of corroborative testimony. Faust did not attempt to present the testimony of anyone who could testify that Faust had made a declaration of his then existing state of mind. The draft letter adds little, if any, corroboration to Faust's testimony to the same facts. Thus, *Parry* is distinguishable.