

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-8-1999

# United States v Morley

Precedential or Non-Precedential:

Docket 98-1894

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"United States v Morley" (1999). *1999 Decisions.* Paper 319.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/319

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 8, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1894

UNITED STATES OF AMERICA,

v.

MICHAEL J. MORLEY, II,
        Appellant

Appeal from the United States District Court
of the Eastern District of Pennsylvania
Criminal Action No. 97-cr-00430-2
District Judge: Hon. Robert F. Kelly

Argued: October 1, 1999

Before: MANSMANN, McKEE, Circuit Judges and
STAPLETON, Senior Circuit Judge

(Filed: December 8, 1999)

ERIC W. SITARCHUK, ESQ. (Argued)
MARTIN C. BRYCE, JR., ESQ.
TERESA E. KIBELSTIS, ESQ.
SALLY A. STEFFEN, ESQ.
Ballard Spahr Andrews & Ingersoll,
 LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Attorneys for Appellants

ROBERT A. ZAUZMER, ESQ.
 (Argued)
WALTER S. BATTY, JR., ESQ.
THOMAS M. GALLAGHER, ESQ.
Office of United States Attorney
615 Chestnut Street
Philadelphia, PA 19106
Attorneys for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge.

We are asked to decide whether the District Court abused its discretion by allowing the prosecution to introduce "prior bad acts" evidence during Michael Morley's trial on charges of criminal conspiracy, bank fraud, mail fraud and wire fraud. Those charges arose from Morley's attestation to a forged signature on a fake will. The evidence in question pertained to an incident that occurred 14 months prior to the events charged in the indictment when Morley asked his parents (both of whom were notaries) to notarize signatures on bonds that had been signed out of their presence. The signatures were forgeries, although the government does not contend that Morley knew that when he asked his parents to notarize the bonds. Rather, the government now contends that the evidence that Morley caused his parents to improperly notarize documents was relevant to his "intent, knowledge, and absence of mistake in signing the fake will of a dead man he had never met." Appellee's Br. at 11. We agree that the District Court abused its discretion by allowing the prosecution to

2

introduce evidence about the improperly notarized bonds. Accordingly, we will vacate the defendant's conviction and order that Morley be given a new trial.1

I.

David Thompson died on January 22, 1996, survived by three cousins: Raymond, Robert and Kenneth Thompson. Shortly after David's death, Robert Thompson contacted Robert Morley in order to get advice on the administration of David's estate. Morley is a Certified Public Accountant. Morley referred Robert to an attorney named Daniel Holmes who was Morley's long-time friend and business partner. Neither Holmes nor Morley had known David Thompson.

It is unclear whether or not David Thompson actually left a will, and no will was found during the ensuing search of David's home. Accordingly, Holmes devised a fraudulent scheme to create a fake will that would appear to leave the entirety of David's estate to Robert and Raymond. Pursuant to their agreement with Holmes, Robert and Raymond each were to receive one-third of David's estate, and Holmes was to receive the remaining third. According to the government, Holmes was to split his share with Morley. The fake will thus made no provision for Kenneth Thompson. Pursuant to that scheme, Holmes drafted a will, forged

_____

1. Morley also argues that there was insufficient evidence to convict him of bank fraud under 18 U.S.C. S 20, that the District Court erred in calculating his sentence by not limiting the loss calculation to 2/3 of the
amount due under the missing will, and that the court incorrectly calculated the total loss under the Sentencing Guidelines. We hold that these arguments are without merit except for his challenge to his conviction for bank fraud.

The government concedes that it did not introduce evidence that the victim bank was a financial institution as defined in 18 U.S.C. S 20. This issue was not raised in the District Court, but the government concedes that "there was insufficient evidence presented on this essential element and agrees that the conviction on Count Two should be vacated." Appellee's Br. at 24. We commend the government for its candor, and we agree that the conviction on that count must be vacated. The government will be precluded from introducing additional evidence to prove this element during the defendant's retrial.

David's signature, and then had the defendant and two other persons "witness" the forged signature.[2]

The fake will that Holmes subsequently drafted was later admitted to probate in Camden County, New Jersey. Thereafter, Holmes and Raymond Thompson took control of David's estate. They established an account under the name "Estate of David L. Thompson," and consolidated and liquidated estate assets.

At trial, the government presented evidence that Morley received substantial sums from the estate account.[3] Morley also arranged for a $100,000 loan from the estate to C&H Drilling, a new business venture of one of Morley's clients. The loan repayments were then directed to Morley who kept some of the proceeds, and distributed the balance to Raymond and Robert Thompson.[4]

In June of 1996 the FBI interviewed Morley in connection with its investigation into the fraudulent bank transactions. During that interview Morley admitted that he had signed the attestation on a document as requested by Holmes. However, Morley insisted that he assumed the signature he was attesting to was genuine because Holmes and another business associate had already witnessed it. Thereafter,

_____

2. The precise order of these events is not clear. The government argues that Morley was present for discussions about creating the fraudulent will, but Morley denies that. He insists that, although he signed the will as a witness to David Thompson's signature, he did not know that David's signature was forged. Robert and Raymond Thompson testified during trial that Morley was present when they discussed fabricating David's will. However, it does appear that Morley and Holmes had an agreement by which they would share one-third of the estate. A letter from Morley to Holmes dated May 22, 1996 stated:"Please let me know where I stand in relation to this because my portion of an Estate valued at $2,021,000 would equal $336,833.33. That is a substantial sum and the payments thereof needs [sic] to be documented." (Appellee's Supplemental Appendix ("Supp. App.") at 259a–261a).

3. The evidence showed that Morley received (1) $120,000 in the form of a cashier's check on February 9, 1996, (2) $150,000 on February 21, 1996, (3) $5,000 on March 5, 1996, (4) $17,000 on March 19, 1996 (for "services to the estate," although Morley later admitted at trial that he did not render any services to the estate).

4. C&H Drilling later defaulted on the loan.

4

Morley, Holmes, Raymond and Robert were all indicted on various charges arising from the fraudulent scheme. Holmes, Raymond and Robert pled guilty and cooperated with the government in the prosecution of Morley.5

Prior to Morley's trial, the government informed Morley that it intended to introduce evidence that 14 months prior to David's death, Holmes had asked Morley to have his parents notarize approximately 100 savings bonds purportedly signed by Joseph DiStefano (the rightful owner), and that Morley had done so. The government would establish that Morley's parents had notarized the bonds as Morley requested, however, DiStefano's signature had actually been forged by Holmes. Morley filed a motion in limine to preclude the government from introducing this evidence.

The government filed a "Response to Defendant's Motion to Preclude Proffered Evidence" in which it argued that the evidence was admissible "pursuant to Fed. R. Evid. 404(b) to prove the defendant's motive, opportunity, intent, preparation, planning, knowledge and absence of mistake." The government also stated that "[e]vidence that the defendant obtained the notarization of over 100 U.S. Savings Bonds. . . when the signatory was neither known nor present is proper to show the defendant's knowledge, intent, plan and modus operandi of falsely witnessing the will of a dead man, who was neither known nor present." The government did not then, nor does it now, argue that the defendant knew that the signatures on the bonds were forgeries, or that it was the defendant who actually notarized the bonds.

The District Court denied the defense motion to exclude the evidence and the matter proceeded to trial where Morley took the witness stand and denied knowingly engaging in a fraudulent scheme. Morley did not deny signing the fake will as a witness, rather he insisted that he had done so believing that the purported signature was genuine.

On cross examination, the Assistant United States

_____

5. Both Raymond and Robert testified against the defendant at trial, however Holmes was not called as a witness.

5

Attorney inquired into the incident regarding the notarized bonds. The government was able to establish that 14 months before Holmes forged Thompson's will, Holmes had asked Morley to get his parents to notarize the aforementioned U.S. Savings Bonds, and that Morley had agreed to do so in return for $5.00 per bond. The government's evidence also showed that the signatures on those bonds were forged. In closing argument, the Assistant United States Attorney referred to the prior incident as follows:

> And here's the big CPA who gets over a hundred bonds, two times in a one-month period, and what's he do? He puts his parents at risk. He asks his parents to do something he knows is wrong. . . . And Michael Morley puts his parents in jeopardy and has them falsely witness the savings bonds. He doesn't want to take the big risk then, he wants his parents to do it.

(Appendix ("App.") at 142a-143a). In addition, despite the fact that the government failed to introduce any evidence tending to show that Morley knew the bonds had been forged, the Assistant United States Attorney argued in closing that the bond evidence should cause the jury to conclude that Morley knew the signing of the will was part of a fraudulent scheme:

> Why does he allow Dan Holmes to bring him a will and ask him to sign it when he knows it's illegal, he knows it's wrong, he knows it's criminal. Why does he do it? Well, Dan Holmes had done this before. And he saw Dan Holmes do this before and he worked with Dan Holmes doing this before and he only got a little bit of money when Dan Holmes did it before and he saw Dan Holmes get a lot of money when he did it before and maybe it could work again. So if you could just go along with it and keep his hands off of it as much as possible, maybe he could ride the coattails of Dan [Holmes].

(Supp. App. at 347a) (emphasis added).

6

Morley was convicted of all charges, and this appeal followed.6

II.

Fed. R. Evid. 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

However, in order for such evidence to be admissible under Rule 404(b), its probative value must outweigh the prejudice inherent in testimony about a defendant's prior "bad acts," Fed. R. Evid. 403. The trial court must inform the jurors of the limited use they may make of such evidence, and also instruct them not to draw any inference of bad character from it. Huddleston v. United States, 485 U.S. 681, 691-92 (1988).

Evidence admitted under Rule 404(b), like all other evidence, must be relevant to some proper purpose. "Evidence is admissible under Rule 404(b) only if it is relevant." Id. at 689. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence . . . more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Here, as in so many cases, inquiries of relevance and proper purpose are intimately intertwined. Evidence that is not relevant, by definition, cannot be offered for a proper purpose, and evidence that may be relevant for some purposes may be irrelevant for the purpose for which it is offered. Moreover, there is no alchemistic formula by which "bad act" evidence that is not relevant for a proper purpose under Rule 404(b) is transformed into admissible evidence.

_____

6. We exercise appellate jurisdiction pursuant to 28 U.S.C. S 1291. We review a trial judge's decision to admit evidence of uncharged offenses for abuse of discretion. United States v. Traitz, 871 F.2d 368, 389 (3d Cir. 1989).

7

Thus, a proponent's incantation of the proper uses of such evidence under the rule does not magically transform inadmissible evidence into admissible evidence."Relevance is not an inherent characteristic," Huddleston, 485 U.S. at 689, "nor are prior bad acts intrinsically relevant to `motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake.' " United States v. Sampson, 980 F.2d 883, 888 (3d Cir. 1992). Thus, when prior bad act evidence is both relevant and admissible for a proper purpose, "the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged." United States v. Himelwright, 42 F.3d 777, 782; United States v. Jemal, 26 F.3d 1267 (3d Cir. 1994).

Here, the government asserts that the challenged evidence was relevant to Morley's "knowledge and intent at the time Holmes asked him to sign the will as a`third witness.' " Appellee's Br. at 17. This refrain is repeated throughout the government's brief.7 Yet, upon close examination, the only connection between Morley's request to his parents to notarize the bonds, and his alleged attestation on the forged will is the inference that Morley was likely to have been guilty of the latter merely because he had previously engaged in "similar" impropriety. This is the very evil that Rule 404(b) seeks to prevent. Evidence pertaining to the notarized bonds is simply not relevant to whether Morley knew the signature on Thompson's will was forged absent the natural (and improper) inference that lurks beneath the surface of the government's use of this evidence. At trial the prosecution did not even attempt to

_____

7. The government argues: "Morley placed his knowledge and intent at issue by denying his involvement in the conspiracy .. . ." Appellee's Br. at 18. "The key element of his involvement in the conspiracy was his witness signature on the will of a dead man he never met." Id. "Evidence of the same two individuals (Holmes and Morley) participating together to obtain false notarization of the signature of another person on U.S. Savings Bonds is highly relevant to show the knowing and intentional behavior of Morley in this case." Id. at 19.

establish that Morley knew the signature on the bonds was forged.[8]

At oral argument before us, the government was represented by an Assistant United States Attorney who had not tried the case, and he had the unenviable task of defending the trial prosecutor's closing argument, and the hodgepodge of explanations the government had offered for the Rule 404(b) evidence. Although he valiantly attempted to do so, his attempts to justify the government's conduct were unsuccessful. When we asked for an articulation of a proper purpose for this evidence at argument, the government responded:

> The evidence was offered to show Mr. Morley's criminal knowledge and criminal intent in engaging in a scheme with Mr. Holmes regarding the fake will. The evidence specifically was that he had gotten his parents to falsely notarize documents that attest the signatures were authentic, made by people in front of them, and that was not actually the case. And this was probative of the fact that Mr. Morley had dealt before with Mr. Holmes knowingly and intentionally in obtaining false signatures on documents, a material issue that had to proved with respect to the fake will.

Transcript of Oral Arguments at 19-20. We then asked: "Q: What is the relevance of what happened in the bond issue to whether on this occasion, sixteen months later . . . he signed the will knowing that the testator wasn't present?" Id. at 23. The government responded:

> The relevance is that he previously knowingly agreed to help his friend, Mr. Holmes, obtain false notary seals on documents attesting that these signatures were placed on the documents by the people whose names

_____

8. We do not mean to suggest that the evidence would necessarily have been proper if the government had shown that Morley knew the signature on the bonds was a forgery. We do suggest, however, that the government's failure to establish that guilty knowledge further undermines the government's assertion that the prior conduct was relevant to Morley's intent in attesting to the forged signature on the fake
will.

appeared there when that was not true. . . . [I]t's a fraudulent act by itself to place those fraudulent seals.[9]

Id. at 23-24. We then asked if the government's explanation was merely an assertion that the evidence of Morley's prior bad acts simply established that he was someone of bad character who was, therefore, more likely to have knowingly engaged in the fraudulent will scheme with Holmes. We asked: "And because he's the kind of guy who had done it before, he's the kind of guy who will do it again[?]" Id. at 24-25. The Assistant United States Attorney responded: "Right." Id. at 25. That refreshingly candid response is the best (and we think the only) explanation of why this evidence was offered in the first place. However, we sought further clarification. We asked: "Why else is it relevant, other than he did it once before, he's the kind of guy that will do it again?" Id. The government responded:

It's not to show that he did it before, he'll do it again. It's to show that he had the prior knowledge of Holmes and what Holmes was doing. He engaged previously with the same intent.

Id. However, that argument assumes that Morley knew that the bonds were forged when he took them to his parents. The prosecution could have called Holmes (who was apparently cooperating pursuant to his plea agreement) to attempt to establish that Morley was told that the signatures on the bonds were forgeries when Morley took them to his parents, but it made no effort to do so. Ironically, after now suggesting that Morley knew the signatures on the bonds were forged, the government asserts in its brief that Morley's belief as to the genuineness of the signatures on the bonds was irrelevant, and there was therefore no need to call Holmes during Morley's trial. The government states, "Despite Morley's complaint about Holmes' absence at trial, there was no need for Holmes to testify about matters not in dispute." Appellee's Br. at 18, n. 5.

During our exchange at oral argument, the government shifted gears. It seized upon Morley's trial testimony that

_____

9. Morley's parents, not Morley, placed the seals on the bonds.

10

the signature on the attestation looked like his, but that he did not remember signing it. The government used that testimony to argue that the evidence regarding the bonds was relevant because it showed Morley signed David Thompson's will as a witness. We then asked the government to explain that connection.

> [By the court]: To the extent that[the evidence] comes in to impeach [Morley] when he says that it looks like my signature . . . I don't recall signing this, you are saying that you used a prior document, fourteen months earlier that he did not sign, that he gave to his parents to show that he signed this document?
>
> A: That's correct.

Transcript of Oral Arguments at 33–34. That explanation is illogical. Moreover, Morley never denied attesting to the purported signature on Thompson's will. As noted above, he admitted that to the FBI when he was first interviewed about the scheme to probate a fraudulent will. In its brief on appeal, the government concedes that "Morley admitted that he signed the will . . . Yet Morley denied knowledge or intent that he agreed to witness a fake will and loot the decedent's estate." Appellee's Br. at 15. Furthermore, even if Morley had denied attesting to the testator's signature, we fail to see how evidence of the prior notarization of bonds would have made it more likely than not that Morley signed the will, absent an improper inference of bad character.

Our concern is only heightened by the explanation the government initially gave in response to defense counsel's motion in limine to exclude this evidence. There, as noted above, the government argued that the evidence was admissible "to prove the defendant's motive, opportunity, intent, preparation, planning, knowledge and absence of mistake." It also argued that the evidence was relevant "to show the defendant's knowledge, intent, plan and modus operandi of falsely witnessing the will of a dead man, who was neither known nor present." It said nothing about handwriting, or establishing that defendant's handwriting was on the will.

The government further strains to justify its resort to the prior misconduct by suggesting that it was relevant to show

11

the relationship between Holmes and Morley, and bore upon Morley's behavior in forging the attestation on Thompson's will. We are told that "[e]vidence of the same two individuals . . . participating together to obtain false notarization of the signature of another person on U.S. Savings Bonds is highly relevant to show the knowing and intentional behavior of Morley in this case." Appellee's Br. at 19. However, this evidence was not necessary to tie Morley to Holmes. That was a given from the very beginning. The government's own brief describes Holmes as Morley's "long-time friend and business partner." Appellee's Br. at 3. In Sampson, we reversed a conviction where the government used evidence of prior illegal drug transactions involving the defendant and his wife as part of the circumstances from which the jury could infer that defendant knew that certain drugs were in his prison cell, and that his wife was the individual who had smuggled them in to him. We rejected that argument because the evidence actually served to establish criminal propensities of the defendant; and to the extent it was relevant, the district court had erred in failing to conduct a balancing test under Rule 403.

Similarly, in United States v. Hans, 738 F.2d 88 (3d Cir. 1984), we rejected the government's attempt to introduce evidence of defendant's record for bank robberies. There, the government first tried to link the defendant to an individual named "Bauman" and then had an agent explain that the focus on Bauman led to the defendant. We stated: "[T]he government had no need to introduce[the evidence] to show that Bauman and [the defendant] knew each other. The prosecution had already established that. . .[the agent's] testimony was therefore cumulative, and excludable on that ground as well." Id. at 94. Simply put, the government can not create an issue where none exists and then rely upon Rule 404(b) to argue that prior misconduct is relevant to the manufactured issue.

Here, the parade of ephemeral explanations marched on as we continued to press for clarification as to why this evidence was relevant. The government argued:

> [T]his same man earlier, Mr. Holmes, came to Mr. Morley and asked him to help in getting false notary

12

seals placed on a document, that it makes it more likely than not that Mr. Morley had knowledge of what Holmes was up to when Holmes then asked him later to put his signature on another document which turns out to be another false statement. Just as false as those notary representations were, they were similarly false, that Mr. Morley was sitting there witnessing the act of David Thompson, which was a false statement. But there's a very clear inference that we submit that can be drawn and that we asked the jury to draw.

Transcript of Oral Arguments at 34-35.

We believe the situation here is analogous to, though not as egregious as (and perhaps not as clear as) United States v. Mothershed, 859 F.2d 585, 589 (8th Cir. 1988). There, the court was concerned about evidence of defendant's prior conviction for possessing stolen bank money. That prior conviction had been introduced at defendant's trial for bank robbery 10 years later. The defendant admitted to having been in the bank the day of the robbery, and admitted to having a large sum of cash, but testified that he did not rob the bank, and that he won the cash gambling at a party before the time of the robbery. The government argued that evidence that the defendant had previously been convicted for possessing stolen bank money was admissible under Rule 404(b) to prove "opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake." Id. at 587. However, the Court of Appeals was not impressed with the prosecution's recitation of the litany of legitimate purposes under Rule 404(b). The courtfirst noted that it had "not been aided in [its] review by the `laundry list' approach taken at trial. Rather than name the particular issue for which this conviction was relevant, it appears that the government simply read the justifications contained in Rule 404(b)." Id. at 588. The court then noted that such an approach was not, by itself, reason to exclude such evidence or to reverse the defendant's conviction, but that "it is a practice we discourage." Id . We agree.

In rejecting the prosecution's attempt to legitimize the prior bad act evidence in Mothershed, the court explained:

We cannot conclude that the prior conviction is relevant to any of these issues. There is only one sense

13

in which we regard that conviction as relevant: it is reasonable to conclude that a person who has been convicted of possessing money that he knows was stolen from a bank is more likely to be a bank robber than are most other people who have no such record. But this is simply an observation about a person's character, and as such, is precisely the kind of evidence that Rule 404(b) is designed to exclude. We do not convict people of crimes simply because of their propensities; we do so because of what they have actually done.

Id. at 589.

Neither a trial court nor an appellate court is comforted when a proponent attempts to justify "bad act" evidence by resorting to a mantra-like recitation of the provisions of Rule 404(b). Accordingly, as we noted above, we require the prosecution to "clearly articulate how that evidence fits into a chain of logical inferences, no link of which can be the inference that because the defendant committed . . . offenses before, he therefore is more likely to have committed this one." Sampson, 980 F.2d at 887. "The government must therefore proffer a logical chain of inference consistent with its theory of the case," Id. at 888, and when it does so, "[t]he district court must put a chain of inferences into the record, none of which is the inference that the defendant has a propensity to commit this crime." Id.

Here, despite the government's protestations to the contrary, evidence of Morley's prior involvement with the improperly notarized bonds is relevant only to show that Morley has certain criminal "propensities," and it is therefore more likely that he knew the signature of the testator on the fake will had been forged. "[W]hile the government's argument was cloaked in terms of [Morley's] intent, the goal here was actually something different; it was to portray [Morley] as a person who" was more likely than not guilty of the charged crimes because he had done something that was illegal in the past. Himelwright, 42 F.3d at 783. The nexus between the conduct Morley was indicted for, and his prior bad acts is even more tenuous because there is no evidence he knew the signatures on the bonds

14

had been forged, he merely presented the signed bonds to his parents and asked them to notarize the signatures as though the bonds had been signed in their presence. Though Morley's conduct with regard to the bonds was clearly wrong, we do not think that it takes on the significance the prosecution seeks to attribute to it.10

When all is said and done, the closing argument of the Assistant United States Attorney who tried this case provides a far more lucid explanation for why this evidence was admitted than the elusive justifications that the government has parroted from the rule. As noted above, in closing, the prosecutor argued:

> And here's the big CPA who gets over a hundred bonds, two times in a one-month period, and what's he do? He puts his parents at risk. He asks his parents to do something he knows is wrong. . . . And Michael Morley puts his parents in jeopardy and has them falsely witness the savings bonds. He doesn't want to take the big risk then, he wants his parents to do it. . . .

App. at 142a-143a. This frontal assault upon the defendant's character is simply not appropriate under our system of laws, and the trial court abused its discretion in admitting it.11 Despite the government's various explanations, we do not think evidence of the notarization of the bonds is probative of Morley's intent in signing the fake will, absent the improper inference of bad character.

The government cites several cases to support its assertion that the District Court did not abuse its discretion in admitting this evidence.12  However, we are not

_____

10. In Commonwealth v. Downing, 357 A.2d 703, 704 (Pa Cmwlth, 1976), the Commonwealth Court of Pennsylvania stated: "[w]e suspect that it is all too common a practice for notaries public to affix their seals to documents not signed in their presence." Though the practice is wrong, and can not be condoned, we doubt it is any less common in New Jersey where Morley was tried than it was in Pennsylvania when the Commonwealth Court made its observation.

11. Defense counsel did not object to the prosecutor's closing. Nevertheless, we believe the initial objection to introducing this evidence
is sufficient to preserve this issue on appeal.

12. See Appellee's Br. at 13-14.

persuaded. In United States v. Wood, 982 F.2d 1 (1st Cir. 1991), the Court of Appeals for the Fifth Circuit affirmed the trial court's admission of testimony that the defendant had previously falsely notarized documents, and signed other persons' names to legal documents. The defendant was an attorney who was on trial for conspiracy to obtain forged signatures on various deeds for a friend. The trial court allowed former members of the defendant's office staff to testify that he had previously signed other persons' names to documents and notarized documents that had not been signed in his presence. During the trial, the defendant had denied fraudulent intent in forging the deeds in question. He insisted that he had obtained the signatures only as an accommodation, and that he had never before signed anyone else's name to a legal document, nor falsely notarized any documents. Accordingly, the court of appeals ruled that the challenged testimony of his former staff was properly admitted under Rule 404(b) to impeach the defendant's own testimony. "Appellant testified that his effort to procure unauthorized signatures was a`one time occurrence.' The proffered evidence thus directly contradicted the testimony of appellant himself. It was also highly relevant on the issue of appellant's intent and thus admissible under Rule 404(b)." Id. at 4. 13

In United States v. Faust, 850 F.2d 575 (9th Cir. 1998), the defendant was convicted of forgery and embezzlement. During his trial, the prosecution introduced letters that defendant had previously fraudulently altered. The trial court allowed the testimony because it concluded that the prior bad acts were "clearly relevant to [the defendant's] state of mind and contradicted his professions of good faith or mistake." Id. at 583. However, the court did so with no analysis, and with no discussion of why the inferences arising from the prior bad acts were consistent with the requirements of Rule 404(b). Id. at 583. The Court of Appeals for the Ninth Circuit affirmed with little discussion other than stating its belief that the prior bad acts were relevant to defendant's good faith in connection with the charged offenses. Our jurisprudence requires more. See

_____

13. We do not mean to infer that evidence of prior forgeries, by itself, is
admissible to establish intent under Rule 404(b).

16

Sampson, supra. Here, neither the government, nor the trial court complied with the procedure that we set forth in Sampson, and that we reiterate above. Accordingly, Faust provides little support for the prosecution's position.

In United States v. Weiler, 385 F.2d 63 (3d Cir. 1967),[14] the defendant was convicted of wilfully making false statements in an application for a license under the Federal Firearms Act. He signed an application for a firearms license in which he swore that he had not previously been convicted of a felony. At trial, the prosecution was allowed to introduce evidence that the defendant had previously been convicted of assault and battery, and the court instructed the jury that the conviction subjected the defendant to a period of imprisonment in excess of one year. The defendant's criminal history was, of course, an element of the offense and, therefore, admissible. However, the prosecution also introduced evidence that the defendant lied about his address to a government investigator, and that he had made false material misrepresentations on an application to the Department of Defense pertaining to his son's miliary service. We concluded that the testimony regarding defendant's false statements about his address was not admissible. Id. at 68 ("We find that it was not sufficiently probative of `willfulness' to be admitted on that issue."). We did not rule upon the admissibility of defendant's prior false declarations on the Department of Defense form. Rather, we concluded that it was sufficiently similar to the charged offense to be "controlled by the sound discretion rule," and we left the determination as to the admissibility of that evidence to the discretion of the trial court on remand for a new trial. Id.

In United States v. Allen, 76 F.3d 1348 (5th Cir. 1996), the Court of Appeals for the Fifth Circuit affirmed the trial court's admission of evidence of prior fraudulent acts in defendant's trial for various charges related to a charged bank fraud. The court reasoned that evidence of defendant's forgeries involving repayment of a $1,600,000 loan was part of the scheme for which he was indicted and therefore not "bad acts" evidence at all. Id. at 1364; ("The

_____

14. Weiler was obviously decided before Sampson.

17

forgeries were the very fraud charged in count ten, and thus . . . not prior bad acts within the meaning of Rule 404(b)"). Evidence of additional forgeries was properly admitted because of the uniqueness of those prior bad acts. The court stated: "We hold that `the circumstances of the extraneous act were so similar to the offense in question that they evince[d] a signature quality -- marking the extraneous act as the handiwork of the accused.' " Allen, 76 F.3d at 1364, citing United States v. Sanchez, 988 F.2d 1384, 1393 (5th Cir. 1993) (alteration added, internal quotation marks omitted). Conduct involving the bonds at issue here clearly does not rise to the level of a "signature crime." The court in Allen also allowed other evidence of uncharged forgeries that "showed motive." Id. at 1365-66. Still other bad act evidence was not subjected to a Rule 404(b) inquiry because the objection went to the prosecution's closing, ("his challenge is to argument, not evidence, and [the defendant] himself introduced the underlying evidence."), or because defense counsel never objected and the prior bad act evidence did not amount to plain error. Id. at 1366 ("we review only for plain error and we find none.").

Thus, none of these cases support the government's position here. The government quite properly reminds us that we have stated "that Rule 404(b) is a rule of `inclusion' rather than `exclusion.' " Appellee's Br. at 12 (citing United States v. Scarfo, 850 F.2d 1015, 1019, and Sampson, supra). However, our recognition of the proper operation of a rule of evidence can neither obliterate the rule, nor be seized upon to circumvent the rule's requirements. This is particularly true when we consider the obvious dangers inherent in evidence of uncharged bad acts, and the adversarial tendency of the proponents of such evidence to be less than candid about their motives for offering evidence that suggests that a defendant's character is suspect. See Sampson, 980 F.2d at 886 ("Although the government will hardly admit it, the reasons proffered to admit prior bad act evidence . . . is often mixed between an urge to show some other consequential fact as well as to impugn the defendant's character").

The fact that Rule 404(b) operates as a rule of inclusion as opposed to operating as a rule of exclusion does not

18

open the flood gates to evidence that is relevant only to establish a defendant's bad character. Thus, we require that such evidence meet the "chain of inference" test set forth in Sampson. See also Himelwright, 42 F.3d at 781-82 (reversing a conviction where the government used 404(b) evidence in closing argument to portray the criminal propensity of the accused), Jemal, 26 F.3d at 1272, and Government of the Virgin Islands v. Harris, 938 F.2d 401, 419 (3d Cir. 1991). This is not a difficult burden to overcome when the evidence truly is relevant to a proper purpose.

We realize that the District Court did give a cautionary instruction here. In its final charge, the court instructed:

> [Y]ou've heard evidence of . . . the alleged act of the defendant obtaining notary seals on bonds of . . . Mr. DeStefano. There are no charges pending in this case with respect to that. You must not consider any of that evidence in deciding if the defendant committed the acts charged in the indictment.
>
> However, you may consider this evidence for other very limited purposes. If you find beyond a reasonable doubt from other evidence in this case that the defendant did commit the acts charged in the indictment, then you may consider evidence of similar alleged conduct on another occasion. . . to determine whether the defendant had the state of mind or intent necessary to commit the crime or crimes charged in the present indictment. . . .
>
> [Y]ou are only permitted to use that other conduct to show his intent . . . in the present indictment. They are not permitted to show that he is - his general character. That would be an improper use of that evidence.

Supp. App. at 371a-72a. However, as noted above, the evidence here only tends to establish the defendant's state of mind in witnessing the will if one views the defendant with the jaundiced vision resulting from the prior misconduct, and the fact that he put his parents at risk. We can find no relevance beyond that improper inference, and the government has not shown us any. Thus, the

19

court's charge can not cure the danger inherent in the testimony about the bonds. "Where the government has not clearly articulated reasons why the evidence is relevant to any legitimate purpose, there is no realistic basis to believe that the jury will cull the proper inferences and material facts from the evidence." Sampson, 980 F.2d at 889. Here, of course, there is no way to limit the government to its clearly articulated theory because no theory was clearly articulated, and the evidence was not relevant to any of the theories that the government did toss against the evidentiary wall of Rule 404(b).

III.

We note that, although the government did produce circumstantial evidence from which the jury could infer that Morley knew that the will was a forgery, we do not believe that evidence was so compelling, nor the prosecution's transgression so inconsequential, that we can conclude that admission of Morley's prior impropriety was harmless error. Accordingly, we will vacate the defendant's conviction, and remand the matter to the District Court for a new trial consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit