NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
—————————

No. 12-1642
—————————

UNITED STATES OF AMERICA

v.

AARON SMITH,

Appellant

—————————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action No. 2-10-cr-00489-002)
District Judge: Honorable Juan R. Sanchez

—————————

Argued November 1, 2012

Before: SLOVITER, AMBRO, and BARRY, <u>Circuit Judges</u>

(Opinion filed: November 30, 2012)

Mark S. Greenberg, Esquire (Argued)
LaCheen Wittels & Greenberg
1429 Walnut Street
Suite 1301
Philadelphia, PA   19102-0000

    *Counsel for Appellant*

Zane David Memeger
Robert A. Zauzmer
Salvatore L. Astolfi
Bernadette A. McKeon, Esquire (Argued)
Office of the United States Attorney

615 Chestnut Street
Suite 1250
Philadelphia, PA   19106

*Counsel for Appellee*

———————

OPINION

———————

AMBRO, <u>Circuit Judge</u>

Aaron Smith was convicted of conspiracy to interfere with interstate commerce by robbery, and interference with interstate commerce by robbery, in violation of 18 U.S.C. § 1951(a), and using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c).  He was sentenced to 360 months' imprisonment.

Smith appeals two evidentiary decisions made by the District Court during his trial: (1) the denial of his motion to suppress a witness identification, and (2) the inclusion of testimony about his past infractions at a halfway house where he was residing at the time of the robbery.   Although we hold that the identification testimony was properly admitted, we conclude that the Court should not have admitted the infraction testimony and this error was not harmless.

## I.      Background

Around 10:00 a.m. on October 27, 2008, the Fox and Hound restaurant in Philadelphia was robbed.  While one robber, a taller, heavier-set man—later identified as Omar Hopkins—led restaurant manager Lenny Lowe at gunpoint into a back office to get money from the restaurant safe, a second robber took employees Valin Barfield and

2

Tyrone Jenkins, and later delivery person Adam Conley, to the same office and tied them with duct tape.

Hopkins was arrested shortly after the robbery and cooperated with investigators, admitting to the robbery and identifying a third participant who never entered the restaurant. He told police that he had known both co-conspirators for only a week, and that he knew them only as "Snipes"—later identified as Kareem Watson—and "A-Dub."

In 2011, police identified Smith as A-Dub based on a report that Smith went by that nickname and in fact had "A-Dub" tattooed on his arm. FBI Agent Stephen McQueen showed two photographs of Smith to Hopkins. He identified one as A-Dub. McQueen also created a photo array containing Smith's photograph and showed it to Lowe, Barfield, and Jenkins. Only Jenkins was able to identify one of the pictures as the second robber, and identified Smith. Before trial, Smith moved to exclude Jenkins's identification, arguing that the identification of him in the photo array was the result of Agent McQueen's influence and thus unreliable. The District Court held a hearing at which Jenkins and McQueen testified, and the motion was denied.

At trial, Jenkins and Hopkins identified Smith as the second robber. When asked if he was "absolutely certain" that Smith was A-Dub, Hopkins responded "[i]t look like him, yes." App. at 465. On cross-examination, however, Hopkins testified that he identified Smith because Smith looked like the pictures he (Hopkins) was shown. On re-direct, Hopkins reconfirmed that Smith was A-Dub, yet conceded he was struggling with that identification because it had been so long since the robbery. At trial, Lowe, Barfield, and Jenkins described the second robber as somewhere between 5'8" and 5'10", wearing

3

tan clothing, and having some facial hair, either a goatee or sideburns. Smith is 5'11".

Hopkins also testified that the three robbers met at a bar on the evening of October 27 to celebrate their success.

In addition to contesting his involvement in the robbery, Smith presented an alibi defense. At the time of the robbery, he was a resident at a halfway house called Kintock, and attended job training at a facility called Connections. Kintock director Frank Guyon testified that, on the day of the robbery, Smith had signed out of Kintock at 7:00 a.m. to go to Connections, signed back into Kintock at 4:22 p.m., and did not sign out again that day. Guyon also testified about Kintock's security, which includes manned entrances and barbed wire surrounding the property. As for the time Smith was signed out of Kintock, Gervin Modest, a computer instructor at Connections, testified that he recorded Smith as present in the Connections computer lab some time between 9:00 and 11:00 a.m. on the morning of the robbery, but did not know how long Smith was at Connections that day. Ronnie Dawson, another Connections employee, also testified that attendees were not supposed to leave without authorization, and that unauthorized absences were occasionally documented, but not always. Smith did not have authorization to leave Connections on the robbery date, nor was any absence noted.

Over Smith's objection, the Government was permitted to elicit testimony from Guyon that Smith had been a resident of Kintock from May to October of 2007 and again from August 2008 to February 2009, that he was ultimately removed from the facility in February of 2009 for failing to return to it, and that he incurred 11 incident reports during his time there for failing to follow rules and regulations. The District Court prevented the

4

Government from referencing the bases of several infractions—such as Smith's refusal to give a urine sample or to take a breathalyzer test, possession of a pornographic DVD, and failure to secure a job—but permitted testimony on other infractions and the total number of incidents. The Government also had Guyon read statements in Smith's Kintock records that he "was unsuccessfully discharged from the program, due to his inability to follow the rules and regulations," "[a]n assessment of Mr. Smith's residency shows that he maintained a below-average level of compliance with the policies and procedures of the program," and "Mr. Smith's overall adjustment was poor." *Id.* at 533–34. The prosecutor also asked Guyon in a leading manner whether "it's pretty clear . . . Mr. Smith was pretty bad at following the rules at your program?," to which Guyon responded "[t]hat's correct." *Id.* at 535. The prosecutor also asked Dawson whether Smith had an "accountability problem" with Connections, to which Dawson replied that, "[b]ased on the records that I reviewed, yes." *Id.* at 558.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We review a district court's decision to admit evidence for abuse of discretion. *United States v. Lee*, 612 F.3d 170, 184 n.14 (3d Cir. 2010).

## III.    Discussion

5

## A.    Identification Testimony

Smith first challenges the District Court's decision to admit Jenkins's identification testimony. The first question in such a challenge is whether the initial identification procedure was unnecessarily or impermissibly suggestive. *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991). This inquiry considers both the suggestiveness of the identification and whether there was good reason to depart from less suggestive procedures. *Id.* Only if a procedure was too suggestive need a court ask whether it should nonetheless be admitted as reliable under the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 199 (1972).

Following a hearing, the District Court concluded that the initial identification procedure used with Jenkins was not unnecessarily suggestive. Smith argues to the contrary because Agent McQueen specifically directed Jenkins to concentrate on the features of the face that do not change, such as the eyes, nose, and ears. Smith does not explain how McQueen's instruction could have directed Jenkins to Smith's photo. Hence the Court did not abuse its discretion by denying his motion to suppress Jenkins's identification testimony.

## B.    Infractions Evidence

Smith also argues that the District Court erred by allowing testimony about his prior bad acts at Kintock and Connections. Federal Rule of Evidence 404(b) states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but evidence of a crime or wrong can be admitted "for another purpose" such

6

as "motive, opportunity, intent, preparation, plan, knowledge, …[or] absence of mistake."

Fed. R. Evid. 404(b)(1)–(2).

Rule 404 is a rule of inclusion rather than exclusion, and evidence should be admitted unless used merely to show propensity or disposition of the defendant to commit the crime. *United States v. Givan*, 320 F.3d 452, 460 (3d Cir. 2003); *United States v. Moore*, 375 F.3d 259, 264 (3d Cir. 2004). The admission of Rule 404(b) evidence is evaluated under the Supreme Court's four-step test: (1) the evidence must have a proper purpose under 404(b), (2) it must be relevant, (3) its probative value must not be outweighed by its potential for prejudicial effect, and (4) the court must charge the jury to consider the evidence only for the limited purpose for which it is admitted. *United States v. Vega*, 285 F.3d 256, 261 (3d Cir. 2002) (citing *Huddleston v. United States*, 485 U.S. 681, 691–92 (1988)). "A proper purpose is one that is probative of a material issue other than character." *United States v. Green*, 617 F.3d 233, 250 (3d Cir. 2010) (quotation omitted). Evidence is relevant if it has "any tendency to make a fact [that is of consequence to the determination of the action] more or less probable than it would be without the evidence." Fed. R. Evid. 401. The Government must "clearly articulate how that evidence fits into a chain of logical inferences, no link of which can be the inference that[,] because the defendant committed offenses before, he therefore is more likely to have committed this one." *United States v. Morley*, 199 F.3d 129, 137 (3d Cir. 1999) (quotation and alteration omitted). Where the defendant failed to request a limiting instruction, we review the lack of such an instruction for clear error. *Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 526 (3d Cir. 2003).

7

The Government argues that this evidence was admissible because Smith's alibi rested on an assumption that he followed the attendance rules of Kintock and Connections, and evidence of his infractions rebutted that assumption. We disagree. Smith's alibi was not that he abided by the attendance rules of either facility. Instead, Smith presented the facilities' own records to show that he was at Connections on the morning of the robbery and at Kintock in the evening when the robbers purportedly met at a bar. He produced testimony to show that security features prevented him from leaving Kintock without signing out. He also introduced evidence that he was not permitted to leave Connections without authorization, and no documentation existed that he was authorized to leave it, or was absent without authorization, on October 27, 2008.

The Government could—and did—produce testimony to show that it was possible for Smith to leave Kintock or Connections without either facility knowing or documenting his absence. But there is no proper purpose under 404(b) for admission of evidence that Smith generally did not abide by the rules of the facilities because his alibi was not based on his decision to follow rules, but on records of his presence. Even the infraction most closely related to the possibility that Smith left the facilities without authorization—that he absconded from Kintock—occurred months after the robbery and could not have been relevant to his motive, intent, or state of mind on the day of the robbery.

Instead, this testimony commented directly, and negatively, on Smith's character. Although the District Court excluded testimony of the most prejudicial infractions, the evidence of other infractions was still relevant only to Smith's character, precisely the

8

evidence Rule 404(b) prohibits. The descriptions from Smith's Kintock file painted a picture of Smith as a rule-breaker and person of poor character. Compounding the error, there was no limiting instruction given to the jury; they may have considered this character evidence well beyond Smith's alibi defense in their determination of Smith's guilt.

Even if the District Court erred by admitting this evidence of Smith's bad acts, we do not reverse a conviction if it is highly probable that the error did not contribute to the judgment of guilt. *United States v. Berrios*, 676 F.3d 118, 131 (3d Cir. 2012). The Government bears the burden of showing harmlessness. *United States v. Cross*, 308 F.3d 308, 326 (3d Cir. 2002). On this record, we cannot conclude that it was highly probable the bad acts evidence did not contribute to the judgment of guilt. Evidence connecting Smith to the robbery is far from overwhelming. It included the two identifications, one of which was undermined on cross-examination and both of which were made years after the robbery; the nickname "A-Dub," supplied by Hopkins, which Smith has tattooed on his arm; and the proximity of Connections to a store Hopkins testified the robbers shopped at before the crime. The bad acts evidence—and the inference that Smith was essentially a bad guy—may have contributed to the jury's determination of Smith's guilt.

In this context, we cannot conclude that the District Court's error was harmless. We thus vacate Smith's conviction and remand the case.